

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 0 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2016 Grand Jury

| UNITED STATES OF AMERICA, | CR 17 CR 00 0278 |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 1959(a)(1), (3), (4), (5), (6): Violent Crime in Aid of Racketeering; 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(D): Possession with Intent to Distribute and Distribution of Controlled Substances; 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), (j)(1): Possessing, Using, Carrying, Brandishing, and Discharging Firearms in Furtherance of, and During and in Relation to, a Crime of Violence, Causing Death; 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime; 18 U.S.C. § 922(g)(1): Felon in Possession of Firearm; 18 U.S.C. § 2(a): Aiding and Abetting; 18 U.S.C. § 1963, 21 U.S.C. § 853, 18 U.S.C. § 924(d), 26 U.S.C. § 5872, and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| JOSE BALMORE ROMERO, <br> aka "Porky," <br> MOISES VILLALOBOS, <br> aka "Guerillero," <br> ROBERTO MEJIA LEVERON, <br> aka "Chacal," <br> HENRY VIDES, <br> aka "Bestia," <br> WILFREDO MELENDEZ, JR., <br> aka "Grumpy," <br> ERWIN ALEXANDER MELGAR, <br> aka "Snoopy," <br> JOSE GARCIA, <br> aka "Jose Antonio Garcia," <br> aka "Criminal," <br> JORGE ALBERTO RAMOS, <br> aka "Gustavo Alvarenga," <br> aka "Miguel Quintanilla," <br> aka "Poison," <br> JESSE PEREZ, <br> aka "Grinch," <br> JOHN GARCIA, <br> aka "Pelon," <br> IRWIN HUGO GARCIA, <br> aka "Droopy," <br> JASON LAMAR ARDOIN, <br> aka "Smokey," <br> CARLOS ALFREDO CARDOZA LOPEZ, <br> aka "Little Boy," | |

JOFFRI MOLINA,
  aka "Espia,"
SAMUEL ALEXANDER PAREDES RIVAS,
  aka "Blacky,"
JORDIN DUARTE,
  aka "Kusko,"
SERGIO ALEXANDER GALINDO,
  aka "Romeo A. Velasquez,"
  aka "Killer,"
JUAN CARLOS HERRERA,
  aka "Diablo,"
  aka "Bicho,"
HENRY TORRES,
  aka "Jeovanny Sandoval,"
  aka "Guanaco,"
  aka "Lil Guapo,"
  aka "Churro,"
NELSON ENRIQUE CORRALES,
  aka "Speedy,"
MARVIN MARTINEZ,
  aka "Espiritu,"
FREDY ENOC FUENTES VILLATORO,
  aka "Killer,"
CARLOS A. ZEPEDA,
  aka "Antonio Meza,"
  aka "Blackie,"
DOUGLAS HENRY GONZALEZ,
  aka "Silly,"
MAGGIE SANKIKIAN,
  aka "Goofy,"
DARYLL DEVONNE MAXION,
  aka "Rocket,"
LUIS LOPEZ,
  aka "Lester G. Arroyo-
      Hernandez,"
  aka "Lester Arroyo,"
  aka "Flaco,"
ROBERTO ESTRADA CARRANZA,
  aka "Espanto,"
BALTHAZAR LEIVA,
  aka "Diablo,"
ALEJANDRO SALVADOR ARENAS,
JOSE RAMIREZ,
  aka "Serio,"
EVER RIVAS,
  aka "Satanas,"
MAURICIO EUGENIO LEIVA,
  aka "Gato," and
JOAQUIN MUNOZ,
  aka "Vago,"

                Defendants.

1   The Grand Jury charges:

2   GENERAL ALLEGATIONS

3   A.   THE RACKETEERING ENTERPRISE

4   1.   At all times relevant to this Indictment, defendants JOSE

5   BALMORE ROMERO, also known as ("aka") "Porky" ("BALMORE"); MOISES

6   VILLALOBOS, aka "Guerillero" ("VILLALOBOS"); ROBERTO MEJIA LEVERON,

7   aka "Chacal" ("LEVERON"); HENRY VIDES, aka "Bestia" ("VIDES");

8   WILFREDO MELENDEZ, JR., aka "Grumpy" ("MELENDEZ"); ERWIN ALEXANDER

9   MELGAR, aka "Snoopy" ("MELGAR"); JOSE GARCIA, aka "Jose Antonio

10  Garcia," aka "Criminal" ("JOSE GARCIA"); JOHN GARCIA, aka "Pelon"

11  ("JOHN GARCIA"); IRWIN HUGO GARCIA, aka "Droopy" ("I. GARCIA"); JASON

12  LAMAR ARDOIN, aka "Smokey" ("ARDOIN"); CARLOS ALFREDO CARDOZA LOPEZ,

13  aka "Little Boy" ("C. LOPEZ"); JOFFRI MOLINA, aka "Espia" ("MOLINA");

14  SAMUEL ALEXANDER PAREDES RIVAS, aka "Blacky" ("S. RIVAS"); JORDIN

15  DUARTE, aka "Kusko" ("DUARTE"); JUAN CARLOS HERRERA, aka "Diablo,"

16  aka "Bicho" ("HERRERA"); HENRY TORRES, aka "Jeovanny Sandoval," aka

17  "Guanaco," aka "Lil Guapo," aka "Churro" ("TORRES"); NELSON ENRIQUE

18  CORRALES, aka "Speedy" ("CORRALES"); MARVIN MARTINEZ, aka "Espiritu"

19  ("MARTINEZ"); CARLOS A. ZEPEDA, aka "Antonio Meza," aka "Blackie"

20  ("ZEPEDA"); DARYLL DEVONNE MAXION, aka "Rocket" ("MAXION"); LUIS

21  LOPEZ, aka "Lester G. Arroyo-Hernandez," aka "Lester Arroyo," aka

22  "Flaco" ("L. LOPEZ"); ROBERTO ESTRADA CARRANZA, aka "Espanto"

23  ("CARRANZA"); BALTHAZAR LEIVA, aka "Diablo" ("B. LEIVA"); ALEJANDRO

24  SALVADOR ARENAS ("ARENAS"); EVER RIVAS, aka "Satanas" ("E. RIVAS");

25  and MAURICIO EUGENIO LEIVA, aka "Gato" ("M. LEIVA") (collectively,

26  the "defendants"); and Jorge Alberto Ramos, aka "Gustavo Alvarenga,"

27  aka "Miguel Quintanilla," aka "Poison" ("Ramos"); Jesse Perez, aka

28  "Grinch" ("Perez"); Sergio Alexander Galindo, aka "Romeo A.

3

Velasquez," aka "Killer" ("Galindo"); Fredy Enoc Funtes Villatoro, aka "Killer" ("Villatoro"); Douglas Henry Gonzalez, aka "Silly" ("Gonzalez"); Maggie Sankikian, aka "Goofy" ("Sankikian"); and Jose Ramirez, aka "Serio" ("Ramirez"); and others known and unknown to the Grand Jury, were members and associates of the Mara Salvatrucha street gang in Los Angeles, otherwise known as MS-13 (hereinafter referred to as "MS-13"), a criminal organization operating in and around Los Angeles, California whose members and associates engaged in, among other things, numerous acts of violence and other crimes, including murder, attempted murder, robbery, assault with deadly weapons, extortion, conspiracy to traffic in narcotics, narcotics trafficking, and possessing firearms while prohibited from so doing. At all times relevant to this Indictment, MS-13 operated within the Central District of California and elsewhere.  MS-13 in Los Angeles, including its leaders, members, and associates, constitutes an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity, which is engaged in, and the activities of which affect, interstate and foreign commerce.  The enterprise constitutes an ongoing organization whose members and associates function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

B.   BACKGROUND OF THE RACKETEERING ENTERPRISE

2.   Mara Salvatrucha was formed in Los Angeles, California in the mid-1980s by immigrants fleeing the civil war in El Salvador. Once in Los Angeles, they organized themselves into a group called Mara Salvatrucha, which was initially largely composed of Salvadoran immigrants.  "Mara" is a Central American term for gang.  "Salva"

refers to El Salvador.  In the 1990s in Los Angeles, Mara Salvatrucha distinguished itself by committing brutal acts of violence against rival gang members and non-gang members.  In the mid-1990s, Mara Salvatrucha became associated with the Mexican Mafia, commonly referred to as "la Eme" (which translates in English to "the M"), and added the number "13" to its name.  The number "13" marks the 13th letter of the alphabet: "M."  Thus, Mara Salvatrucha became MS-13. While MS-13 originated in Los Angeles, over the years, MS-13 spread as its members were deported to El Salvador and because its members traveled to other locations in the United States and abroad.  As a result, in addition to operating in Los Angeles, MS-13 operates nationally and internationally, with more than ten thousand members regularly conducting gang activities in at least ten states and Washington, D.C., and with thousands more conducting gang activities in Central America and Mexico.

3.  MS-13 in Los Angeles, and MS-13 nationally and internationally, is largely comprised of persons from Central America, including El Salvador, Honduras, and Guatemala.  Although each MS-13 locale has a common origin, MS-13 in Los Angeles operates differently in El Salvador, Honduras, Guatemala, and the other states within the United States.  Notwithstanding, clique names in other parts of the United States are named for existing cliques in Los Angeles.  At times, MS-13 members from other geographic locations travel to Los Angeles to participate in leadership meetings; however, MS-13 in Los Angeles is independent, self-governing, and makes its own decisions.  Conversely, MS-13 members in Los Angeles are sometimes called upon to provide input in other parts of the country.

1   Additionally, MS-13 members in Los Angeles traffic narcotics from Los

2   Angeles to other parts of the country.

3   C.   THE ENTERPRISE IN LOS ANGELES, CALIFORNIA

4        4.   One distinguishing feature about MS-13 in Los Angeles is

5   that it is beholden to the Mexican Mafia, which is a criminal

6   organization that united Hispanic gang members under a single

7   alliance that operates within the California state prison system, the

8   federal prison system, the streets and suburbs of large cities

9   throughout Southern California, and elsewhere.  Members of the

10  Mexican Mafia, commonly referred to as a "Carnal," "Brother," "Big

11  Homie," "Tio" (Spanish for "uncle"), and/or "Padrino" (Spanish for

12  "godfather"), typically come from the ranks of local Southern

13  California Hispanic street gangs, including MS-13.  By controlling

14  the criminal activities occurring within prison facilities, providing

15  protection for imprisoned members and associates of Hispanic gangs,

16  and imposing discipline, often in the form of acts of violence,

17  against both individuals and street gangs who fail to adhere to its

18  directives, the Mexican Mafia has risen to the position where it now

19  exercises control over Hispanic street gangs operating throughout the

20  State of California.  Specifically, its individual members control

21  one or more Hispanic street gangs, which serve as the power base

22  through which the Mexican Mafia members operate their individual

23  criminal enterprises.  In return for its integration into the Mexican

24  Mafia, MS-13 members receive the Mexican Mafia's protection in the

25  neighborhoods and also in prison.

26       5.   Like all gangs associated with the Mexican Mafia in

27  California, MS-13 is required to pay a specified sum, commonly known

28  as "taxes" or "rent" on a regular basis to a member of the Mexican

1  Mafia.  In Los Angeles, each MS-13 clique or sub-set contributes a
2  portion of its profits, derived primarily from narcotics sales and
3  extortion of street vendors, to the Mexican Mafia.  Each member of an
4  MS-13 clique, whether incarcerated or not, is expected to contribute
5  financially to their clique's rent payment.  In return for the tax
6  payments, the Mexican Mafia provides protection to all MS-13 members
7  incarcerated in county, state and federal prisons and jails in
8  California.  Additionally, and in exchange for the tax payments, the
9  Mexican Mafia allows MS-13 to sell narcotics in its territories.
10 Finally, the Mexican Mafia ensures that no other gang operates in MS-
11 13's territory or otherwise interferes with MS-13's criminal
12 activities.  Failure of MS-13 to pay its tax to the Mexican Mafia
13 will result in a "green light" on MS-13, that is, a general order
14 from the Mexican Mafia to assault or kill any incarcerated MS-13
15 member in any facility controlled by the Mexican Mafia.  It is
16 unlikely that MS-13 in Los Angeles could continue to exist if it
17 chose not pay its taxes, tantamount to extortion payments, to the
18 Mexican Mafia.
19      6.   The Mexican Mafia invites some incarcerated MS-13 members
20 to join its leadership.  In this role, those MS-13 members who are
21 chosen to participate in managerial roles for the Mexican Mafia
22 complete various tasks, including, but not limited to, facilitating
23 the smuggling of narcotics into the prison facilities, carrying out
24 orders of discipline and/or determining who will carry out orders of
25 discipline, representing the Mexican Mafia amongst other leaders of
26 the prison/custodial facility, and ensuring that MS-13 members, and
27 other Hispanic gang members under their control follow the Mexican
28 Mafia's code of conduct.  Additionally, incarcerated MS-13 members

may still actively participate in MS-13's activities on the outside, including contributing rent money to their respective cliques, hearing disputes between MS-13 members and cliques, determining and/or agreeing or disagreeing with punishment, and ordering discipline for violating the Mexican Mafia's and MS-13's codes of conduct.   While incarcerated, MS-13 members follow the Mexican Mafia's code of conduct.   One important rule of the Mexican Mafia is that any inmate who is in custody for a sex offense is to be assaulted and possibly killed.   Failure to comply with this rule can also result in discipline.

7.   MS-13's regular tax payment to the Mexican Mafia comes from MS-13's cliques and is typically paid by the overall leader(s) of MS-13.   MS-13 obtains its regular tax payment from each of MS-13's cliques on a monthly or yearly basis.   MS-13 cliques obtain their payments from their individual members.   MS-13's overall leader(s) and clique leaders are involved in the coordination of tax collection throughout the territory MS-13 controls in Los Angeles. Additionally, each clique leader is responsible for collecting extortion, in the form of gang "dues," from each clique member in order to pay each clique's allotted monthly or yearly extortion payment to the Mexican Mafia.   If a clique member does not pay his/her "dues" to the clique, the clique shot caller will "green light" the delinquent member and punishment will be meted out, usually by violence.

8.   In Los Angeles, MS-13 operates under the "Los Angeles Program," which is distinct from programs in El Salvador, Honduras, Guatemala, and other parts of the United States, whereby its leaders and members make all decisions concerning how and when a new person

becomes a member of MS-13, how MS-13 operates, when discipline is meted out, when a clique is responsible for paying its extortionate rent payments, the geographical boundaries of each clique, and the identity of the shot callers and leaders.

9. MS-13 operates through subsets known as "cliques," which are usually named for a street within a clique's territory, or for the neighborhood in which the clique operates. MS-13 has approximately 20 cliques operating in Los Angeles, including, but not limited to, "7-11," "Adams," "Centrales," "Coronado," "Francis," "Fulton," "Harvard," "Hollywood," "Leeward," "MLK," "Normandie," "Parkview," "Pasadena," "Southside," "Tiny Winos," "Travieso," and "Vagos." Each clique typically has one or more leader at any given point, commonly referred to as "shot callers," who are responsible for, among other things, managing the narcotics trafficking operation in the clique's territory, collecting extortion payments, directing the day-to-day management of the clique, enforcing MS-13's and the Mexican Mafia's codes of conduct, resolving intra-clique disputes, and representing their respective cliques at the MS-13 general meetings. At various times throughout this conspiracy, the following defendants were shot callers of MS-13's cliques: Jesse Perez for the Adams clique; defendant BALMORE, who for a time was also MS-13's overall leader, for the Centrales clique; defendants ARDOIN, JOSE GARCIA, and VIDES for the Coronado clique; Jorge Alberto Ramos for the Leeward clique; defendants JOHN GARCIA and LEVERON for the Hollywood clique; defendant MELGAR for the Normandie clique; defendant I. GARCIA for the Pasadena clique; and defendant MELENDEZ for the Tiny Winos clique. Shot callers are also responsible for

1    meeting with other clique leaders in order to achieve their common
2    criminal purposes and to resolve disputes between the cliques.
3          10.   A clique adds new members through an initiation ritual
4    known as "jumping in," during which several existing MS-13 members
5    beat up a prospective MS-13 member for 13 seconds.   Once jumped in,
6    an MS-13 member is expected to participate fully in MS-13's criminal
7    activities.
8          11.   MS-13 members sometimes signify their membership with
9    tattoos reading "Mara Salvatrucha," "MS," "MS-13," or other
10   variations of the gang's name.   MS-13 members typically refer to
11   other members by their monikers, or nicknames, and often do not know
12   fellow gang members' legal names.
13         12.   MS-13 has a self-imposed code of conduct, which is imposed
14   and enforced to maintain compliance among its members.   MS-13 also
15   adopts and enforces the Mexican Mafia's rules.   MS-13 enforces its
16   rules and promotes discipline among its members by imposing monetary
17   fines and threatening and committing acts of violence against members
18   who break the rules.   This is known as being "courted" or
19   "regulated."   MS-13, through its leadership or individual cliques,
20   can vote for MS-13 members to be disciplined for violating MS-13's or
21   the Mexican Mafia's codes of conduct.   Depending on the severity of
22   the violation, MS-13, through its leadership or individual cliques,
23   will decide whether the violator will receive a beating for 13, 26,
24   or 39 seconds, all factors of 13, and will select at least three to
25   four MS-13 members to administer the beatings, with one member
26   counting aloud the seconds.   The premise underlying these punishments
27   is that a person who broke a rule should be punished by beatings for
28   either 13 seconds, or for a multiple of 13 seconds.   Additionally,

1   for even more serious violations of MS-13's or the Mexican Mafia's

2   codes of conduct, MS-13, through its leadership or individual

3   cliques, may vote to introduce weapons into the beatings, to include

4   knives, bats and/or pipes.   Once an MS-13 member has been

5   disciplined, the individual cliques may also vote to eject the

6   disciplined member from their cliques.   If a member is voted out of

7   the clique, he/she must be "jumped out" of the clique, which means

8   that member will receive another beating.   However, that member may

9   join a different MS-13 clique, if the new clique votes to accept that

10  member.   To join a new clique, that member must be "jumped in," or

11  beaten for a designated period of time, usually 13 seconds.

12      13.   MS-13 has zero tolerance for members and associates who

13  cooperate with law enforcement.   Once MS-13 has evidence that someone

14  has cooperated with law enforcement, by receiving and reviewing law

15  enforcement reports or videos of interviews, MS-13 issues a "green

16  light" as to that person, which is an order that if any MS-13 member

17  sees the person who is allegedly or actually cooperating with law

18  enforcement, that person is to be killed on sight.

19      14.   MS-13 members also engage in acts of violence against

20  innocent citizens and rival gang members in its territory.

21  Participation in violent acts increases the respect accorded to

22  members who commit violent acts.   Additionally, commission of violent

23  acts by MS-13 members enhances the gang's overall reputation for

24  violence in the community, resulting in the intimidation of citizens

25  in MS-13's territory.

26      15.   Between the mid-1990s, when MS-13 became affiliated with

27  the Mexican Mafia, and 2013, MS-13's cliques in Los Angeles were

28  usually led by one or two MS-13 members.   In December 2013 and April

2014, the Los Angeles Metropolitan Task Force on Violent Gangs ("LAMTFVG") conducted two takedowns in Los Angeles, which resulted in approximately 60 arrests of MS-13 members, including MS-13's core leadership in Los Angeles.  Two high-ranking MS-13 members, who were the first "made" Mexican Mafia brothers from MS-13, were arrested, along with the overall leader or shot caller of MS-13, in addition to several former leaders of MS-13.  The arrests of several layers of MS-13 leadership in Los Angeles created a leadership vacuum wherein no MS-13 member wanted to emerge as the overall MS-13 leader because they feared being targeted by law enforcement.  Despite the leadership vacuum, MS-13 Los Angeles continues to operate and conduct its criminal activity while simultaneously struggling to reconstitute its primary overall leadership.

16.  MS-13 claims territory throughout the City and County of Los Angeles, including areas in all of the Los Angeles Police Department's Bureaus.  Historically and currently, MS-13's territorial strongholds were/are the geographical areas encompassing Rampart, Koreatown, Hollywood, and parts of the San Fernando Valley, including North Hollywood and Van Nuys.  MS-13 members write or paint graffiti in the areas in which they control to identify the area as controlled by MS-13.

17.  MS-13 also controls Lafayette Park located at Wilshire Boulevard and North Hoover Street in Los Angeles, which is controlled by the Coronado clique.  MS-13 members often meet at Lafayette Park to discuss gang business and mete out punishment for violations of MS-13's code of conduct.  Additionally, MS-13 controls approximately one fourth of MacArthur Park, located between S. Park View Street and S. Alvarado Street, and 6th and 7th Streets, bisected by Wilshire

1    Boulevard.  In the late 1990s, the Mexican Mafia divided MacArthur

2    Park into four sections, to be controlled by four separate gangs,

3    including MS-13.

4        18.  On May 10, 2004, the City of Los Angeles obtained a

5    permanent injunction against MS-13, enjoining its members from, among

6    other things, associating with known MS-13 members in the areas

7    outlined in the injunction, confronting, intimidating, challenging or

8    threatening any person known to be a witness to any activity of MS-

9    13, selling drugs, possessing dangerous weapons, and defacing or

10   marking any public or private property (graffiti) ("Los Angeles

11   Injunction").

12       19.  Narcotics sales provide the bulk of MS-13's profits.  As

13   long as MS-13 pays its tax to the Mexican Mafia, MS-13 members are

14   authorized, exclusively, to sell narcotics in MS-13-controlled

15   territories.  Individual MS-13 members who sell narcotics are often

16   required to provide a portion of their narcotics proceeds to the shot

17   caller of the clique.  This money is used by the shot caller for a

18   variety of purposes, including paying the clique's rent to the

19   overall MS-13 leader and thus the Mexican Mafia, paying legal fees

20   for MS-13 members in need, helping MS-13 members in need in El

21   Salvador and other points abroad, and purchasing weapons that are

22   maintained by the clique in their territory for protection.  If a

23   clique member earns money for the clique by selling drugs or other

24   criminal ventures, and contributes a portion to the shot caller, this

25   money is oftentimes considered their rent contribution to the clique.

26       20.  MS-13 also derives income from the extortion of street and

27   food vendors who operate in MS-13 controlled territory.  On a clique

28   level, the clique shot caller identifies targets for extortion and

1   coordinates which clique member is authorized to collect extortion

2   from each vendor.  MS-13 extorts both legitimate and illegitimate

3   businesses alike, though MS-13 tends to focus on illegitimate or

4   "grey-market" businesses.  These businesses are often owned or run by

5   illegal immigrants, who rarely report this extortion to law

6   enforcement, despite the threats of violence which accompany the

7   extortion.

8        21.  Additionally, MS-13 receives income from the collection of

9   proceeds from MS-13 controlled "casitas."  Casitas are gang-

10  associated establishments where illicit activity is conducted, often

11  times involving prostitution, gambling and the sale of alcohol and

12  narcotics.  These casitas are known to operate twenty-four hours a

13  day, but are the busiest between 2:00 a.m. and 6:00 a.m., after all

14  California Department of Alcoholic Beverage Control ("ABC") licensed

15  establishments are closed.  MS-13 members, as well as non-gang-

16  affiliated members of the neighborhood and surrounding neighborhood

17  who are not U.S. citizens, but live in the United States, known as

18  "paisas," frequent the casitas and engage in prostitution, gambling,

19  consumption of drugs and alcohol, and sales of drugs and alcohol.

20  The MS-13 associate or member running the casita collects the profits

21  from all sales of drugs and alcohol, prostitution and gambling.  The

22  MS-13 associate or member running the casita also pays a portion of

23  the casita's profits, known as "rent," typically to the shot caller

24  of the clique who controls the neighborhood.

25  D.   PURPOSES OF THE ENTERPRISE IN LOS ANGELES

26       22.  The purposes of the MS-13 enterprise include, but are not

27  limited to, the following:

28

14

1        a.   Enriching members and associates of the Mexican Mafia

2   through criminal activities, including drug sales, gun sales, and

3   extortion, as well as the remittance of proceeds generated as a

4   result of MS-13's criminal activities (referred to as "taxes");

5        b.   Preserving, promoting, and protecting the power,

6   territory, and profits of MS-13 and its members and associates,

7   through threats of violence and actual acts of violence, including

8   robbery, extortion, assault, attempted murder and murder;

9        c.   Exposing and punishing MS-13 members and associates

10   who are perceived to have violated MS-13's and the Mexican Mafia's

11   codes of conduct;

12        d.   Maintaining MS-13's control and authority over its

13   territory, often through threats, intimidation and acts of violence

14   committed against local residents and rival gangs; and

15        e.   Violently retaliating against rival gang members or

16   perceived outsiders who challenge MS-13's authority or who fail to

17   pay debts owed to MS-13 members and associates.

18   E.   THE MEANS AND METHODS OF THE ENTERPRISE IN LOS ANGELES

19      23.   The means and methods by which the defendants and their

20   associates conduct and participate in the conduct of the affairs of

21   MS-13 include the following:

22        a.   Members and associates of the enterprise conspired to

23   commit, attempted, and commited, acts of violence to protect and

24   expand the enterprise's criminal operation, including assault and

25   murder, directed against rival gang members, neighborhood residents

26   and visitors, and to violently discipline insubordinate members of

27   the enterprise;

28

b.   Members and associates of the enterprise acquired, possessed, carried, and used deadly weapons, including firearms, in the course of the criminal enterprise's criminal activities;

c.   Members and associates of the enterprise promoted a climate of fear in the community through threats of harm and violence;

d.   Members and associates of the enterprise participated in narcotics trafficking, including the purchase and sale of controlled substances, extortion, firearms sales, robberies, burglaries, and the operation and collection of rent from casitas to generate income;

e.   Members and associates of the enterprise frequently engaged in the aforementioned criminal activity in the presence of other MS-13 gang members and/or associates in order to enhance the status within MS-13 of those affirmatively conducting criminal acts; and

f.   Members and associates of the enterprise used various techniques to avoid law enforcement scrutiny of the enterprise's criminal activities and to evade and frustrate law enforcement, such as the use of coded language to discuss criminal activities and other counter-surveillance techniques; and

g.   Members and associates of the enterprise protected and strengthened MS-13's standing by following the direction of the Mexican Mafia leadership; by corresponding with members of MS-13 and the Mexican Mafia through prison visits, telephone calls, and written correspondence; by remitting portions ("taxes") of drug sales and other illegal activities to Mexican Mafia members and associates; and

1  by carrying out violent acts against targets designated by Mexican

2  Mafia members and associates.

COUNT ONE

[18 U.S.C. § 1962(d)]

Paragraphs 1 through 23 of the General Allegations are re-alleged and incorporated by reference as if fully set forth herein.

A.  OBJECT OF THE RACKETEERING CONSPIRACY

Beginning on a date unknown, and continuing to on or about May 10, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, JOHN GARCIA, I. GARCIA, ARDOIN, C. LOPEZ, MOLINA, S. RIVAS, DUARTE, HERRERA, TORRES, CORRALES, MARTINEZ, ZEPEDA, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, E. RIVAS, and M. LEIVA, and others known and unknown to the Grand Jury, being persons employed by and associated with the MS-13 criminal enterprise, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts involving:

1.     Murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, 190, and 664;

2.     Extortion, in violation of California Penal Code Sections 21a, 31, 182, 518, 519, 520, and 664;

3.     Robbery, in violation of California Penal Code Sections 21a, 31, 182, 211, 212, 212.5, 213, and 664;

4.     Multiple offenses involving trafficking in controlled substances, including methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846;

5.     Multiple acts indictable under Title 18, United States Code, Section 1955 (relating to the prohibition of illegal gambling businesses); and

6.     Multiple acts indictable under Title 18, United States Code, Section 1344 (relating to financial institution fraud).

It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

B.   MEANS BY WHICH THE OBJECT OF THE RACKETEERING CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.     Defendant BALMORE was the overall shot caller for MS-13 Los Angeles. As the overall shot caller, BALMORE oversaw MS-13's drug trafficking activities, coordinated the collection and distribution of extortionate taxes, conducted and attended MS-13 meetings, during which defendant BALMORE disseminated orders to MS-13's general leadership and membership, authorized the "jumping in" of new members and the assault of members who were in bad standing with MS-13,

1   authorized killing of rival gang members, and communicated with the

2   Mexican Mafia leadership on behalf of MS-13.

3       2.    Defendants VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR,

4   JOSE GARCIA, Ramos, Perez, JOHN GARCIA, I. GARCIA, and ARDOIN, and

5   others known and unknown to the grand jury, were shot callers of MS-

6   13's cliques and had responsibility over their respective clique's

7   day-to-day activities, including rent collection, narcotics

8   trafficking, witness intimidation, maintaining the clique's firearms,

9   directing violence against members of the community, ensuring their

10  clique's rent was paid to the Mexican Mafia, ordering discipline of

11  clique members who violated MS-13's code of conduct, grooming and

12  developing new MS-13 members, and maintaining and/or expanding his

13  clique's territory.

14      3.    Defendants BALMORE, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE

15  GARCIA, JOHN GARCIA, I. GARCIA, ARDOIN, CORRALES, MARTINEZ, ZEPEDA,

16  E. RIVAS, M. LEIVA, Ramos, and Perez, others known and unknown to the

17  Grand Jury, attended MS-13 clique and leadership meetings.

18      4.    Defendant TORRES, and others known and unknown to the Grand

19  Jury, organized and coordinated MS-13's criminal activity from

20  prison.

21      5.    Defendants BALMORE, VILLALOBOS, LEVERON, VIDES, and Ramos,

22  and others known and unknown to the Grand Jury, would direct MS-13

23  members to commit crimes, including murders, assaults, extortions,

24  and narcotics trafficking, to promote and further the activities of

25  MS-13.

26      6.    Defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ,

27  JOSE GARCIA, JOHN GARCIA, I. GARCIA, ARDOIN, C. LOPEZ, MOLINA, S.

28  RIVAS, DUARTE, Galindo, HERRERA, TORRES, CORRALES, MARTINEZ, MAXION,

RAMIREZ, M. LEIVA, Villatoro, Gonzalez, Ramos, and Perez, and others known and unknown to the Grand Jury, committed and threatened acts of violence, including murders, assaults, robberies, and extortions, against citizens of the community and rival gang members within MS-13's territory, to promote and further the activities of MS-13.

7.   Defendants VILLALOBOS, LEVERON, VIDES, MELENDEZ, I. GARCIA, C. LOPEZ, MOLINA, S. RIVAS, DUARTE, HERRERA, TORRES, CORRALES, MARTINEZ, Perez, Villatoro, Galindo, and Gonzalez, and others known and unknown to the Grand Jury, would discuss, possess, use, and/or direct others to use firearms in furtherance of acts of violence, including murders and assaults, to enforce the authority of MS-13.

8.   Defendants MELGAR, ZEPEDA, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, RAMIREZ, E. RIVAS, Perez, Galindo, Villatoro, Gonzalez, Sankikian, and others known and unknown to the Grand Jury, would possess and distribute controlled substances in the neighborhoods controlled by MS-13.

9.   Defendants MELGAR, L. LOPEZ, CARRANZA, B. LEIVA, and ARENAS, and others known and unknown to the Grand Jury, would operate, manage, patrol, supervise and collect proceeds from MS-13 controlled casitas for more than 30 days at a time where dice, percentage games played with cards, and selling chances were engaged in by casita customers.

10.   Defendant MAXION, and others known and unknown to the Grand Jury, without lawful authority, would possess identifications, personal checks, and access devices in other peoples' names with the intent to commit, or to aid or abet, or in connection with, any unlawful activity.

C.   OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on the following dates, defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, Ramos, Perez, JOHN GARCIA, I. GARCIA, ARDOIN, C. LOPEZ, MOLINA, S. RIVAS, DUARTE, Galindo, HERRERA, TORRES, CORRALES, MARTINEZ, Villatoro, ZEPEDA, Gonzalez, Sankikian, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, Ramirez, E. RIVAS, and M. LEIVA, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On or about December 10, 2007, defendant JOHN GARCIA was in a vehicle with fellow MS-13 members, who conducted a drive-by shooting in the area of 2486 West Venice Boulevard, Los Angeles, California, killing N.V. and E.S., a rival gang member.

Overt Act No. 2:   On or about April 19, 2008, defendant ARDOIN and two unindicted co-conspirators demanded money from D.H., repeatedly punched D.H. in the face, and forcibly removed cash from D.H.'s pocket.

Overt Act No. 3:   On or about September 6, 2009, defendant JOHN GARCIA and an unindicted co-conspirator extorted money from a hot dog vendor who was operating in the vicinity of Santa Monica Boulevard and Western Avenue, Los Angeles, California, within MS-13 territory.

Overt Act No. 4:   On or about November 5, 2009, Gonzalez conspired to sell cocaine in the vicinity of 2910 Leeward Avenue, Los Angeles, California, located within MS-13 territory.

1    Overt Act No. 5:    On or about April 10, 2010, within MS-13
2  territory, defendant JOSE GARCIA robbed G.M., said "we are MS mother
3  fucker," removed a firearm from his waistband, and shot one round
4  into the air.

5    Overt Act No. 6:    On or about June 9, 2010, defendant MELENDEZ
6  possessed a 7-inch, spring-loaded folding knife within MS-13
7  territory.

8    Overt Act No. 7:    On or about August 13, 2010, defendant
9  MELENDEZ and two unidentified co-conspirators, in the area of 1026
10 South Norton Avenue, Los Angeles, California, within MS-13 territory,
11 approached victim H.H., inquired where H.H. was from, told H.H. "this
12 is MS-13's neighborhood," and repeatedly punched H.H.

13   Overt Act No. 8:    On or about September 1, 2010, within MS-13
14 territory, defendant MELENDEZ ran toward L.G.'s vehicle, shouted
15 "MS!," used the handle of a knife to shatter L.G.'s left rear
16 passenger door window and the rear windshield, and stabbed L.G. in
17 the arm with his knife.

18   Overt Act No. 9:    On or about November 21, 2010, defendant
19 MAXION violated the Los Angeles Injunction by associating with
20 another MS-13 member in a no-trespassing area.

21   Overt Act No. 10:    On or about April 12, 2011, Sankikian sold
22 approximately 4.34 grams of cocaine and 2.34 grams of methamphetamine
23 to an undercover police officer.

24   Overt Act No. 11:    On or about July 26, 2011, Centrales clique
25 members got into an altercation with rival gang members.  Later that
26 evening, defendant BALMORE, in his capacity as the shot caller of the
27 Centrales clique, organized the Centrales' clique's retaliation for
28 the altercation, which included defendant BALMORE handing another

23

1  Centrales clique member a firearm for use against the rival gang

2  members.

3      Overt Act No. 12:   On or about July 27, 2011, Centrales clique

4  members, in defendant BALMORE's presence, killed a rival gang member

5  with whom they had an altercation the day before.

6      Overt Act No. 13:   On or about August 3, 2011, defendant

7  BALMORE conducted a Centrales clique meeting wherein defendant

8  BALMORE told all Centrales clique members to stay off the streets and

9  advised that defendant BALMORE was harboring one of the Centrales

10 clique members wanted by law enforcement.

11     Overt Act No. 14:   In or about August 2011, defendant BALMORE

12 drove a confidential informant acting at the direction of law

13 enforcement ("CHS-8") to the location where the Centrales clique

14 members killed a rival gang member on July 27, 2011.  Defendant

15 BALMORE directed CHS-8 to knock on a door to a residence and walk

16 away.  Defendant BALMORE then spoke to the resident and told CHS-8

17 that defendant BALMORE told the person who lived at the residence not

18 to speak with law enforcement about what the person observed the

19 night of the July 27, 2011 murder or MS-13 would harm her children.

20     Overt Act No. 15:   In or after August 2011, defendant BALMORE

21 told CHS-8 that he was surprised that law enforcement located the

22 July 27, 2011 murder weapon because only defendant BALMORE and one

23 other Centrales clique member knew where the firearm was located.

24     Overt Act No. 16:   In or after August 2011, defendant BALMORE

25 told CHS-8 that he was at the scene of the July 27, 2011 and

26 explained how it happened.

27

28

Overt Act No. 17:    On or about November 26, 2011, defendant E.
RIVAS violated the Los Angeles Injunction by associating with other
MS-13 members in Lafayette Park in Los Angeles, California.

Overt Act No. 18:    On or about November 28, 2011, defendant
VIDES spray-painted "MS-13" on an apartment building located at 356
South Rampart, Los Angeles, California, within MS-13 territory.

Overt Act No. 19:    On or about December 12, 2011, defendant
VIDES and an unindicted co-conspirator asked C.R. which gang he was
from; chased C.R. in a vehicle; brandished a firearm; and discharged
the firearm twice, in an attempt to shoot victim C.R.

Overt Act No. 20:    On or about December 12, 2011, defendant
VIDES tagged "MS" on the wall of a liquor store in the area of 306 S.
Bonnie Brae Street in Los Angeles, California, within rival gang
territory.

Overt Act No. 21:    On or about March 11, 2013, at an MS-13-run
casita, located at 900 S. Fedora Street, Los Angeles, California,
within MS-13 territory, defendant MAXION possessed approximately .25
grams of methamphetamine.

Overt Act No. 22:    On or about July 31, 2013, within MS-13
territory, Villatoro sold approximately 53.3 grams of methamphetamine
to a confidential informant acting at the direction of law
enforcement ("CHS-2").

Overt Act No. 23:    On or about September 11, 2013, within MS-13
territory, Villatoro sold approximately 27 grams of methamphetamine
to CHS-2.

Overt Act No. 24:    On or about October 11, 2013, Villatoro
possessed a Colt Mustang .380 caliber semiautomatic pistol, bearing
serial number MS15175.

<u>Overt Act No. 25:</u>   On or about October 21, 2013, defendants MELGAR, Ramos, and ARDOIN, and other unindicted co-conspirators, attended an MS-13 general meeting wherein it was announced that the Coronado clique would give up control over the area of Coronado Street and Wilshire Boulevard to the Leeward clique to avoid discipline.

<u>Overt Act No. 26:</u>   On or about October 23, 2013, by telephone using coded language, Ramirez agreed to sell two ounces of methamphetamine to CHS-2 for $600 per ounce.

<u>Overt Act No. 27:</u>   In or around March 2014, defendant LEVERON collected extortionate rent payments from MS-13-run casitas belonging to an unindicted co-conspirator.

<u>Overt Act No. 28:</u>   On or about April 30, 2014, by telephone using coded language, an unindicted co-conspirator contacted a confidential informant acting at the direction of law enforcement ("CHS-1") in order to pay the Pasadena clique's annual taxes.

<u>Overt Act No. 29:</u>   On or about June 9, 2014, by telephone using coded language, defendant L. LOPEZ and a confidential informant acting at the direction of law enforcement ("CHS-4") discussed whether defendant L. LOPEZ could procure two ounces of methamphetamine.

<u>Overt Act No. 30:</u>   On or about June 24, 2014, at an MS-13 run casita located at 1139 3/4 South Irolo Street, Los Angeles, California ("Irolo Casita"), within MS-13 territory, defendant L. LOPEZ sold approximately 3.6 grams of methamphetamine to a confidential informant acting at the direction of law enforcement ("CHS-3") for $60.

1    <u>Overt Act No. 31:</u>   On or about July 1, 2014, at the Irolo

2  Casita, within MS-13 territory, defendants L. LOPEZ and B. LEIVA sold

3  approximately 1.9 grams of methamphetamine to CHS-3 for $40.

4    <u>Overt Act No. 32:</u>   On or about July 7, 2014, by telephone using

5  coded language, Perez and CHS-1 discussed a narcotics purchase.

6    <u>Overt Act No. 33:</u>   On or about July 7, 2014, by telephone using

7  coded language, Perez and CHS-1 agreed that Perez would hold the

8  narcotics and a firearm for a few days so that CHS-1 could purchase

9  them.

10    <u>Overt Act No. 34:</u>   On or about July 10, 2014, within MS-13

11  territory, Perez sold approximately 56.1 grams of methamphetamine to

12  CHS-1 for $1,000.

13    <u>Overt Act No. 35:</u>   On or about July 10, 2014, Perez sold a BB

14  gun to CHS-1.

15    <u>Overt Act No. 36:</u>   On or about July 10, 2014, by telephone

16  using coded language, Perez and CHS-1 spoke about the fact that the

17  gun Perez sold CHS-1 was a BB gun, and Perez denied knowing the gun

18  was a BB gun, but agreed to refund CHS-1's payment.

19    <u>Overt Act No. 37:</u>   On or about July 14, 2014, by text message

20  using coded language, defendant L. LOPEZ agreed to sell CHS-4 two

21  ounces of methamphetamine.

22    <u>Overt Act No. 38:</u>   On or about July 15, 2014, defendant B.

23  LEIVA met with CHS-4 at the Irolo Casita.

24    <u>Overt Act No. 39:</u>   On or about July 15, 2014, by telephone

25  using coded language, defendant L. LOPEZ told CHS-4 that defendant L.

26  LOPEZ would be late for their drug transaction, scheduled to occur at

27  the Irolo Casita, but suggested that CHS-4 could provide the money

28

for two ounces of methamphetamine to defendant B. LEIVA, who could provide the methamphetamine to CHS-4.

Overt Act No. 40:   On or about July 15, 2014, at the Irolo Casita, within MS-13 territory, defendant L. LOPEZ sold approximately 54.5 grams of methamphetamine to CHS-4 for $1,400.

Overt Act No. 41:   On or about August 9, 2014, CHS-1 met with defendant BALMORE, who advised that incarcerated MS-13 members gave defendant BALMORE money via green dot cards, which money would be given to Mexican Mafia members.

Overt Act No. 42:   On or about August 10, 2014, CHS-1 met with defendant BALMORE and an unindicted co-conspirator, who showed CHS-1 and defendant BALMORE videos and paperwork from a federal criminal case proving that a former MS-13 associate was cooperating with law enforcement.

Overt Act No. 43:   On or about August 13, 2014, by text message using coded language, Galindo told CHS-1 that the price for a handgun was $300.

Overt Act No. 44:   On or about August 14, 2014, by telephone using coded language, Galindo provided his address to CHS-1 for a firearm sale transaction.

Overt Act No. 45:   On or about August 14, 2014, by telephone using coded language, Galindo told CHS-1 that he was in front of the alley so that Galindo and CHS-1 could conduct their firearms transaction.

Overt Act No. 46:   On or about August 14, 2014, Galindo sold a .380 caliber Taurus revolver, Model 85, bearing serial number JC68874, to CHS-1 for $300.

Overt Act No. 47:   On or about August 15, 2014, defendants L. LOPEZ and B. LEIVA were running the Irolo Casita, where law enforcement found 3.3 grams of methamphetamine, glass pipes, two electronic scales, a revolver, and ammunition for the revolver.

Overt Act No. 48:   On or about August 30, 2014, by text message using coded language, Gonzalez told CHS-1 that Gonzalez could sell CHS-1 three ounces of methamphetamine.

Overt Act No. 49:   On or about August 31, 2014, by text message using coded language, Gonzalez asked CHS-1 whether CHS-1 still wanted three ounces of methamphetamine.

Overt Act No. 50:   On or about September 1, 2014, by telephone using coded language, Gonzalez spoke to CHS-1 to confirm their three-ounce methamphetamine deal for the following day.

Overt Act No. 51:   On or about September 2, 2014, by telephone using coded language, Gonzalez told CHS-1 that Gonzalez was picking up the methamphetamine from his source of supply and that CHS-1 should have the money ready.

Overt Act No. 52:   On or about September 2, 2014, by telephone using coded language, Gonzalez provided CHS-1 the location of the methamphetamine deal and informed CHS-1 that CHS-1 needed to provide the money for the methamphetamine up front.

Overt Act No. 53:   On or about September 2, 2014, by telephone using coded language, Gonzalez spoke to CHS-1, and they agreed to travel together to the location to meet the methamphetamine source of supply.

Overt Act No. 54:   On or about September 2, 2014, Gonzalez sold approximately 82.3 grams of actual methamphetamine to CHS-1 for $1,700.

Overt Act No. 55:   On or about September 2, 2014, Gonzalez told CHS-1 that Gonzalez had shot a rival gang member.

Overt Act No. 56:   On or about September 5, 2014, by telephone using coded language, Galindo told CHS-1 that Galindo had narcotics available for purchase.

Overt Act No. 57:   On or about September 7, 2014, by telephone using coded language, Galindo offered to sell CHS-1 a nine-millimeter handgun.

Overt Act No. 58:   On or about September 8, 2014, by text message using coded language, Galindo informed CHS-1 that the firearm would cost $400.

Overt Act No. 59:   On or about September 8, 2014, by text message using coded language, Galindo told CHS-1 that Galindo had two ounces of methamphetamine and the firearm for sale, and that Galindo would hold the firearm for CHS-1.

Overt Act No. 60:   On or about September 9, 2014, by text message using coded language, Galindo told CHS-1 that the transactions for the methamphetamine and firearm would take place near Galindo's residence.

Overt Act No. 61:   On or about September 9, 2014, Galindo sold approximately 54.8 grams of methamphetamine and a Sig Sauer, model P228, 9mm pistol bearing serial number B209535, with seven rounds of assorted 9mm ammunition to CHS-1 for $1,500.

Overt Act No. 62:   On or about September 10, 2014, by telephone using coded language, Galindo called CHS-1, who inquired of Galindo whether Galindo had an additional two ounces of methamphetamine and Galindo affirmed that he had the additional methamphetamine and agreed to meet CHS-1 the following day.

Overt Act No. 63:   On or about September 15, 2014, by text message using coded language, Gonzalez and CHS-1 agreed to do another deal for methamphetamine like the prior deal on September 2, 2014.

Overt Act No. 64:   On or about September 16, 2014, by telephone using coded language, Gonzalez told CHS-1 that Gonzalez had the methamphetamine for their transaction.

Overt Act No. 65:   On or about September 16, 2014, Galindo sold approximately 53.5 grams of methamphetamine to CHS-1 for $1,100.

Overt Act No. 66:   On or about September 18, 2014, by telephone using coded language, Gonzalez told CHS-1 that Gonzalez had three ounces of methamphetamine for their narcotics transaction.

Overt Act No. 67:   On or about September 18, 2014, by telephone using coded language, Gonzalez told CHS-1 that two ounces of methamphetamine would cost $1,150.

Overt Act No. 68:   On or about September 18, 2014, by telephone using coded language, Gonzalez told CHS-1 that defendant Gonzalez was on his way to drop off the methamphetamine at CHS-1's residence.

Overt Act No. 69:   On or about September 18, 2014, defendant Gonzalez sold approximately 55.7 grams of methamphetamine to CHS-1 for $1,150.

Overt Act No. 70:   On or about September 20, 2014, by telephone using coded language, Galindo asked CHS-1 whether defendant L. LOPEZ, who was claiming to be an MS-13 member, actually was an MS-13 member.

Overt Act No. 71:   On or about September 21, 2014, within MS-13 territory, Galindo, and several unindicted co-conspirators, assaulted victim S.L. by kicking him numerous times after S.L. was knocked to the ground.

1    <u>Overt Act No. 72:</u>   On or about September 21, 2014, within MS-13
2    territory, Galindo assaulted victim M.J. by striking her head with a
3    beer bottle.

4    <u>Overt Act No. 73:</u>   On or about September 24, 2014, by telephone
5    using coded language, Gonzalez told CHS-1 that the day before,
6    Coronado clique members entered Leeward clique territory and painted
7    graffiti in the area of Hoover and Leeward and that the Leeward
8    clique members were prepared to retaliate, including by defendant
9    Gonzalez shooting at members of the Coronado clique.

10   <u>Overt Act No. 74:</u>   On or about September 24, 2014, by telephone
11   using coded language, defendant VIDES, from the Coronado clique, told
12   CHS-1 that he was the person who entered the Leeward clique's
13   territory, and the two agreed to find a time and place to discuss the
14   issues between the Coronado and Leeward cliques.

15   <u>Overt Act No. 75:</u>   On or about September 24, 2014, by telephone
16   using coded language, Gonzalez and CHS-1 discussed meeting with
17   members of the Coronado clique about the graffiti in the Leeward
18   clique's territory, and defendant Gonzalez told CHS-1 that he was
19   going to bring a firearm to the meeting.

20   <u>Overt Act No. 76:</u>   On or about September 24, 2014, by telephone
21   using coded language, defendant VIDES and CHS-1 agreed that the
22   meeting about the dispute between the Coronado and Leeward cliques
23   would take place in Lafayette Park.

24   <u>Overt Act No. 77:</u>   On or about September 24, 2014, defendants
25   VIDES, JOSE GARCIA, ARDOIN, all Coronado clique members, and Ramos,
26   Galindo, and Gonzalez, both Leeward clique members, and CHS-1 met at
27   Lafayette Park at which time defendant VIDES got into a physical
28   fight with CHS-1.

1    <u>Overt Act No. 78:</u>   On or about September 24, 2014, by telephone

2    using coded language, Galindo warned CHS-1 that law enforcement was

3    in the area of Lafayette Park and that CHS-1 should be careful.

4    <u>Overt Act No. 79:</u>   On or about September 24, 2014, by telephone

5    using coded language, Galindo offered to pick up CHS-1 to bring him

6    to a meeting at CHS-1's residence, and Galindo said that he was on

7    his way to the location.

8    <u>Overt Act No. 80:</u>   On or about September 24, 2014, by telephone

9    using coded language, defendants BALMORE, ARDOIN, and Ramos decided

10   that defendant VIDES should be "regulated," or physically

11   disciplined, and ejected from the Coronado clique, for breaking MS-

12   13's rules.

13   <u>Overt Act No. 81:</u>   On or about September 25, 2014, defendant

14   VIDES spray-painted "MS" on the interior first floor hallway of 2325

15   Ocean View Avenue, Los Angeles, California, located within MS-13

16   territory.

17   <u>Overt Act No. 82:</u>   On or about September 30, 2014, by telephone

18   using coded language, Ramos and CHS-1 discussed the tension between

19   the Coronado and Leeward cliques.

20   <u>Overt Act No. 83:</u>   On or about October 4, 2014, defendants

21   VIDES, ARDOIN, and Galindo, and other members of the Coronado clique

22   met with CHS-1 to discuss Gonzalez's brandishing of a firearm at a

23   Coronado clique member during the September 24, 2014 fight at

24   Lafayette Park and defendant VIDES' yelling of "follow Sur!" at that

25   time, and the group discussed that a general meeting would be held

26   when defendant VIDES was available so that MS-13 could physically

27   discipline defendant VIDES.

28

1    <u>Overt Act No. 84:</u>   On or about October 4, 2014, by text message
2    using coded language, Galindo asked CHS-1 whether CHS-1 deposited
3    money into an unindicted co-conspirator's inmate account.

4    <u>Overt Act No. 85:</u>   On or about October 4, 2014, by telephone
5    using coded language, Galindo told CHS-1 that Pasadena clique members
6    wanted to fight with Gonzalez because during the September 24, 2014
7    fight at Lafayette Park, Gonzalez pointed a firearm at Pasadena
8    clique members.

9    <u>Overt Act No. 86:</u>   On or about October 11, 2014, by telephone
10   using coded language, Ramos spoke to CHS-1 about missing an MS-13
11   general meeting, that an unindicted co-conspirator was in town from
12   San Francisco to handle MS-13 business, that if any MS-13 member was
13   going to be disciplined at the upcoming MS-13 meeting, that everyone
14   in attendance must agree on the discipline, and that the overall
15   leader of MS-13 must be nominated and not self-appointed.

16   <u>Overt Act No. 87:</u>   On or about October 13, 2014, by telephone
17   using coded language, Ramos and CHS-1 discussed an MS-13 general
18   meeting which was run by an unindicted co-conspirator wherein a
19   dispute arose about the identity of a Mexican Mafia's brother's
20   secretary.

21   <u>Overt Act No. 88:</u>   On or about October 15, 2014, by telephone
22   using coded language, an incarcerated unindicted co-conspirator asked
23   CHS-1 whether CHS-1 was obtaining methamphetamine from Ramos, and
24   asked CHS-1 to contact defendant Ramos so that defendant Ramos could
25   provide methamphetamine to the incarcerated unindicted co-
26   conspirator.

27   <u>Overt Act No. 89:</u>   On or about October 17, 2014, by text
28   message using coded language, Galindo texted CHS-1 and signed off

34

with "trucha," which is shorthand for Mara Salvatrucha and a warning to stay alert.

Overt Act No. 90:    On or about October 20, 2014, Galindo met with CHS-1 and informed CHS-1 that an unindicted co-conspirator from the Park View clique would be collecting the extortion money from all of MS-13 cliques for payment to the Mexican Mafia.

Overt Act No. 91:    On or about October 24, 2014, by text message using coded language, Galindo asked CHS-1 whether there would be an MS-13 general leadership meeting the next day.

Overt Act No. 92:    On or about October 26, 2014, by telephone using coded language, Perez asked CHS-1 about the MS-13 general meeting taking place that day, and PEREZ identified the Adams clique members who should be in attendance.

Overt Act No. 93:    On or about October 26, 2014, defendants BALMORE, LEVERON, VIDES, MELENDEZ, MELGAR, I. GARCIA, ARDOIN, Ramos, Perez and other known MS-13 members, attended an MS-13 general meeting that was held at an unindicted co-conspirator's residence located on Olive Street, Huntington Park, California, and as the overall leader of MS-13 Los Angeles, defendant BALMORE ran the meeting.

Overt Act No. 94:    On or about October 26, 2014, during the MS-13 general meeting, defendant BALMORE searched all attendees for wires and recording devices.  When an unindicted co-conspirator announced that he had an unindicted co-conspirator on speakerphone, defendant BALMORE seized the unindicted co-conspirator's cellular telephone, removed the battery, and threw the telephone to the ground.

Overt Act No. 95:   On or about October 26, 2014, during the MS-13 general meeting, defendants BALMORE, LEVERON, VIDES, MELENDEZ, MELGAR, I. GARCIA, and ARDOIN, Ramos, Perez, and other known MS-13 members, discussed which member would "take the keys" to MS-13, meaning be MS-13's overall leader in Los Angeles.  When nobody volunteered, defendants BALMORE, LEVERON, VIDES, MELENDEZ, MELGAR, I. GARCIA, ARDOIN, Ramos, Perez, and other known MS-13 members agreed that MS-13 would be run by the leaders of each clique.

Overt Act No. 96:   On or about October 26, 2014, during the MS-13 general meeting, defendant VIDES was removed as the shot caller of the Coronado clique and defendant ARDOIN was reinstated as the Coronado clique's shot caller.

Overt Act No. 97:   On or about October 26, 2014, during the MS-13 general meeting, defendant BALMORE and Ramos chose defendant I. GARCIA, and two other unindicted co-conspirators, to administer discipline to defendant VIDES for violating MS-13's code of conduct.

Overt Act No. 98:   On or about October 26, 2014, during the MS-13 general meeting, defendant I. GARCIA and two other unindicted co-conspirators assaulted defendant VIDES for 39 seconds, for violating MS-13's code of conduct.

Overt Act No. 99:   On or about October 31, 2014, by telephone using coded language, Gonzalez told CHS-1 that Gonzalez had been walking around his neighborhood selling narcotics.

Overt Act No. 100:   On or about November 2, 2014, by telephone using coded language, defendant I. GARCIA and CHS-1 discussed collection of extortionate rent payments.

Overt Act No. 101:   On or about November 2, 2014, by telephone using coded language, defendant I. GARCIA, CHS-1, and an unindicted

co-conspirator discussed that defendant I. GARCIA already paid MS-13's rent to the Mexican Mafia.

Overt Act No. 102:   On or about November 3, 2014, by telephone using coded language, Ramos told CHS-1, who requested three ounces of methamphetamine, that each ounce of methamphetamine was $400.

Overt Act No. 103:   On or about November 4, 2014, by telephone using coded language, Ramos told CHS-1 that he had a narcotics runner who could deliver narcotics to CHS-1's residence.

Overt Act No. 104:   On or about November 11, 2014, by telephone using coded language, defendant JOSE GARCIA and CHS-1 discussed the Mexican Mafia brother to whom MS-13 should pay its taxes.

Overt Act No. 105:   On or about November 11, 2014, by telephone using coded language, defendant JOSE GARCIA asked CHS-1 to advocate to the Mexican Mafia for MS-13 Los Angeles' leadership to be under the control of a group, not just a single person.

Overt Act No. 106:   On or about December 11, 2014, within MS-13 territory, defendant MAXION possessed approximately 16.6 grams of methamphetamine and a revolver, of unknown caliber, with an obliterated serial number.

Overt Act No. 107:   On or about December 8, 2014, by telephone using coded language, defendant BALMORE told CHS-1 that defendant BALMORE's narcotics supplier was on vacation.  Defendant BALMORE asked CHS-1 whether CHS-1 wanted a small or large quantity of methamphetamine and said that if CHS-1 wanted a larger quantity, then the deal would likely get done more quickly.  CHS-1 told defendant BALMORE that CHS-1 wanted up to a half kilogram of methamphetamine and defendant BALMORE told CHS-1 that defendant BALMORE would inquire with his narcotics supplier.

1       <u>Overt Act No. 108:</u>  On or about December 20, 2014, by telephone

2   using coded language, Perez and CHS-1 discussed the MS-13 cliques'

3   annual dues requirement of $600, which could be made in monthly

4   payments of $50.

5       <u>Overt Act No. 109:</u>  On or about December 27, 2014, by text

6   message using coded language, Perez told CHS-1 that Perez had all of

7   the Adams clique members ready to pay their clique dues before New

8   Year's Eve.

9       <u>Overt Act No. 110:</u>  On or about December 29, 2014, by telephone

10  using coded language, defendant TORRES and Perez, and CHS-1 discussed

11  Adams clique politics and that an incarcerated MS-13 member would

12  dispense any orders pertaining to the clique through Perez or CHS-1.

13      <u>Overt Act No. 111:</u>  On or about January 4, 2015, by telephone

14  using coded language, defendant TORRES and CHS-1 discussed an

15  upcoming general meeting, who is going to run MS-13 in Los Angeles,

16  uniform rules for the Adams cliques in Los Angeles, Maryland,

17  Virginia, Washington, D.C., and El Salvador, and that defendant

18  TORRES was in communication with MS-13 members in three different

19  prisons in El Salvador.

20      <u>Overt Act No. 112:</u>  On or about January 4, 2015, by telephone

21  using coded language, defendant TORRES told CHS-1 that defendant I.

22  GARCIA was the shot caller of the Pasadena clique, provided CHS-1

23  with defendant I. GARCIA's telephone number, and asked CHS-1 to

24  contact defendant I. GARCIA about gang business.

25      <u>Overt Act No. 113:</u>  On or about January 6, 2015, defendant I.

26  GARCIA met with CHS-1 to discuss MS-13 business, including that an

27  unindicted co-conspirator wanted three or four MS-13 members who were

28  not incarcerated to run MS-13 Los Angeles, and that MS-13's cliques

must decide whether to pay the full $600 rent payment or $50 monthly rent payments to the Mexican Mafia.

Overt Act No. 114:  On or about January 7, 2015, defendant ZEPEDA, CHS-1, and several unindicted co-conspirators met at an unindicted co-conspirator's residence in Los Angeles, California, where defendant ZEPEDA introduced himself as working for Chapo Guzman's Cartel and offered to sell CHS-1 large amounts of narcotics.

Overt Act No. 115:  On or about January 9, 2015, by telephone using coded language, CHS-1 called defendant I. GARCIA to advise that CHS-1 was with defendant MELENDEZ, who had the Tiny Winos clique's annual rent money.

Overt Act No. 116:  On or about January 16, 2015, by telephone using coded language, defendant ZEPEDA asked CHS-1 whether a marijuana dispensary located at 27th Street and Western Avenue in Los Angeles, California, was raided by the police and suggested that the dispensary should have been moved to another location.

Overt Act No. 117:  On or about January 20, 2015, by text message using coded language, defendant TORRES asked CHS-1 whether CHS-1 wanted to purchase a new Tec-9 pistol for $650.

Overt Act No. 118:  On or about January 20, 2015, by text message using coded language, defendant TORRES told CHS-1 that if CHS-1 ever needed firearms, defendant TORRES could obtain them.

Overt Act No. 119:  On or about January 21, 2015, by text message using coded language, defendant TORRES told CHS-1 that the price for the Tec-9 went up to $750 because the seller had three other buyers.

1    Overt Act No. 120:  On or about January 21, 2015, by text
2    message using coded language, defendant TORRES told CHS-1 that he
3    wanted to smuggle narcotics into prison.

4    Overt Act No. 121:  On or about January 21, 2015, by text
5    message using coded language, defendant TORRES told CHS-1 that he
6    would receive a price for "crystal," referring to methamphetamine.

7    Overt Act No. 122:  On or about January 21, 2015, by text
8    message, defendant TORRES sent CHS-1 a photograph of a firearm.

9    Overt Act No. 123:  On or about January 21, 2015, by text
10   message, defendant TORRES told CHS-1 that the firearm was used, but
11   was not "hot," meaning law enforcement was not looking for the
12   firearm.

13   Overt Act No. 124:  On or about January 21, 2015, at defendant
14   TORRES' direction, an unidentified co-conspirator sold CHS-1 an
15   Intratec model TECDC9, 9mm Luger caliber pistol, bearing serial
16   number D073812, with one high capacity ammunition magazine and a
17   barrel extension for $750.

18   Overt Act No. 125:  On or about January 24, 2015, by telephone
19   using coded language, Perez told CHS-1 that Perez spoke with
20   defendant TORRES about obtaining firearms.

21   Overt Act No. 126:  On or about January 26, 2015, by telephone
22   using coded language, Sankikian told CHS-1 that she was still selling
23   narcotics and would get back to CHS-1 about the price for two ounces
24   of methamphetamine.

25   Overt Act No. 127:  On or about January 26, 2015, by telephone
26   using coded language, Sankikian told CHS-1 that one ounce of
27   methamphetamine was $330 and two ounces of methamphetamine would cost
28   $620.

Overt Act No. 128:   On or about January 27, 2015, by telephone using coded language, CHS-1 asked Sankikian whether they could do their drug deal on Thursday and Sankikian told CHS-1 that she would call her supplier, Munoz, and call CHS-1 back.

Overt Act No. 129:   On or about January 27, 2015, by telephone using coded language, Perez told CHS-1 that Perez still had the Adams clique's rent money.

Overt Act No. 130:   On or about January 27, 2015, by telephone using coded language, defendant ZEPEDA contacted CHS-1 and requested that CHS-1 assist defendant ZEPEDA in locating someone who owed defendant ZEPEDA a large narcotics debt.

Overt Act No. 131:   On or about January 28, 2015, by telephone using coded language, Sankikian told CHS-1 that Sankikian must first obtain the methamphetamine from her narcotics supplier, Munoz, before she could sell it to CHS-1.

Overt Act No. 132:   On or about January 28, 2015, by telephone using coded language, Sankikian told CHS-1 that if CHS-1 needed heroin, Sankikian could provide heroin as well.

Overt Act No. 133:   On or about January 28, 2015, by telephone using coded language, Sankikian told CHS-1 that she could obtain an additional ounce of methamphetamine, for a total of three ounces of methamphetamine.

Overt Act No. 134:   On or about January 29, 2015, by telephone using coded language, Sankikian told CHS-1 that she could sell three ounces of methamphetamine for $950.

Overt Act No. 135:   On or about January 29, 2015, by telephone using coded language, Sankikian told CHS-1 that they needed to meet

1    at exactly 2:30 p.m. because Sankikian's narcotics supplier, Munoz,
2    was worried that CHS-1 was setting them up with law enforcement.

3         Overt Act No. 136:  On or about January 29, 2015, by telephone
4    using coded language, Sankikian and CHS-1 agreed to conduct the
5    narcotics transaction in CHS-1's garage.

6         Overt Act No. 137:  On or about January 29, 2015, within MS-13
7    territory, Sankikian and Munoz sold approximately 82.3 grams of
8    methamphetamine to CHS-1 for $1,250.

9         Overt Act No. 138:  On or about January 29, 2015, by telephone
10   using coded language, Sankikian asked CHS-1 whether the
11   methamphetamine Sankikian sold CHS-1 was of good quality and told
12   CHS-1 about Sankikian's various narcotics suppliers.

13        Overt Act No. 139:  On or about January 30, 2015, by telephone
14   using coded language, defendant ZEPEDA asked CHS-1 to demand payment
15   for narcotics that defendant ZEPEDA supplied to a marijuana
16   dispensary located at West 8th Street and Hoover Street in Los
17   Angeles, California, located within MS-13 territory, and defendant
18   ZEPEDA told CHS-1 that if the person did not pay, they may have to
19   "check" the person, meaning assault the person.

20        Overt Act No. 140:  On or about January 30, 2015, by telephone
21   using coded language, defendant ZEPEDA, CHS-1, and the owner of the
22   marijuana dispensary located at West 8th Street and Hoover Street in
23   Los Angeles, California discussed the debt owed to defendant ZEPEDA
24   by the owner of the marijuana dispensary.

25        Overt Act No. 141:  On or about January 30, 2015, by telephone
26   using coded language, defendant ZEPEDA offered to introduce CHS-1 to
27   defendant ZEPEDA's narcotics supplier so that CHS-1 could get into
28   the business of selling narcotics.

1    Overt Act No. 142:   On or about January 31, 2015, by text
2    message using coded language, defendant TORRES told CHS-1 that
3    defendant TORRES needed to purchase two pieces of heroin to be
4    smuggled into a prison.

5    Overt Act No. 143:   On or about February 1, 2015, CHS-1 and an
6    unindicted co-conspirator met with defendant ZEPEDA at defendant
7    ZEPEDA's residence wherein defendant ZEPEDA stated that he was
8    working for both the Sinaloa Cartel and the La Linea Cartel and
9    wanted to get CHS-1 and the unindicted co-conspirator involved in
10   narcotics trafficking.

11   Overt Act No. 144:   On or about February 4, 2015, by telephone
12   using coded language, defendant ZEPEDA asked CHS-1 to accompany
13   defendant ZEPEDA to the marijuana dispensary located at West 8th
14   Street and Hoover Street in Los Angeles, California, within MS-13
15   territory, to meet with the owner about the debt owed to defendant
16   ZEPEDA for narcotics supplied by defendant ZEPEDA.

17   Overt Act No. 145:   On or about February 5, 2015, defendant
18   BALMORE possessed a ledger containing the names, monikers, and
19   telephone numbers for MS-13 shot callers and members, including
20   defendants LEVERON, I. GARCIA, ARDOIN, Perez, and Gonzalez, as well
21   as the frequency of extortionate rent payments (clique dues) made by
22   cliques toward their annual amounts owed to the Mexican Mafia.

23   Overt Act No. 146:   On or about February 6, 2015, by telephone
24   using coded language, defendant TORRES asked CHS-1 whether CHS-1 was
25   interested in buying "crystal," referring to methamphetamine, and
26   CHS-1 inquired of defendant TORRES to whom the Adams clique should
27   remit their rent money.

28

Overt Act No. 147:   On or about February 6, 2015, by telephone using coded language, Sankikian asked CHS-1 whether CHS-1 liked the methamphetamine Sankikian sold him and told CHS-1 that Sankikian had several available narcotics suppliers.

Overt Act No. 148:   On or about February 7, 2015, by telephone using coded language, defendant TORRES told CHS-1 that each clique's shot caller needed to have a say in how to collect rent.

Overt Act No. 149:   On or about February 7, 2015, by telephone using coded language, defendant TORRES asked CHS-1 whether CHS-1 would travel halfway between Los Angeles, California, and San Diego, California, to pick up narcotics to be smuggled into a prison.

Overt Act No. 150:   On or about February 17, 2015, by telephone using coded language, defendant ZEPEDA told CHS-1 that CHS-1's methamphetamine order was ready.

Overt Act No. 151:   On or about February 18, 2015, by telephone using coded language, defendant ZEPEDA and CHS-1 discussed the buying and selling of narcotics.

Overt Act No. 152:   On or about February 18, 2015, within MS-13 territory, defendant ZEPEDA sold approximately 445.1 grams of methamphetamine to CHS-1 for $3,800.

Overt Act No. 153:   On or about February 22, 2015, defendant ZEPEDA told CHS-1 that a Mexican Mafia brother was to be killed and offered the "job" to an unindicted co-conspirator.

Overt Act No. 154:   On or about February 24, 2015, by telephone using coded language, defendant TORRES told CHS-1 that defendant TORRES wanted to contribute to the Adams clique's rent.

Overt Act No. 155:   On or about February 25, 2015, defendant ZEPEDA, CHS-1, and unindicted co-conspirators met in a Burger King

parking lot in Los Angeles, California, and discussed defendant ZEPEDA's representation that a Mexican Mafia brother was to be killed and the fact that defendant ZEPEDA lied about the kill order and as a result, the Mexican Mafia brother demanded an immediate payment of $5,000 from defendant ZEPEDA to keep his life.

Overt Act No. 156:  On or about March 4, 2015, by telephone using coded language, Sankikian asked CHS-1 about a narcotics transaction for the following day.

Overt Act No. 157:  On or about March 5, 2015, by telephone using coded language, Sankikian told CHS-1 that each ounce of methamphetamine would cost $350, and they agreed to conduct the narcotics transaction later that day.

Overt Act No. 158:  On or about March 5, 2015, by text message using coded language, Sankikian provided CHS-1 with MUNOZ's address, the location for their narcotics transaction.

Overt Act No. 159:  On or about March 5, 2015, Munoz and Sankikian sold approximately 54.8 grams of methamphetamine to CHS-1; CHS-1 paid Munoz $500 and paid Sankikian $200 for brokering the transaction.

Overt Act No. 160:  On or about March 16, 2015, by telephone using coded language, defendants M. LEIVA and I. GARCIA discussed MS-13 clique extortionate rent payments, including which cliques were delinquent.

Overt Act No. 161:  On or about March 16, 2015, by telephone using coded language, defendant TORRES told CHS-1 that defendant TORRES had the Adams clique's rent money.

Overt Act No. 162:  On or about March 17, 2015, by telephone using coded language, Perez told CHS-1 that Perez obtained the

information for the Mexican Mafia member to whom the Adams clique must pay its rent, that Perez only had $100 to contribute toward the Adams clique's rent, and that the Adams clique was going to have a meeting the following week.

Overt Act No. 163: On or about March 17, 2015, by text message using coded language, defendant TORRES asked CHS-1 whether CHS-1 found a methamphetamine supplier.

Overt Act No. 164: On or about March 19, 2015, by telephone using coded language, defendants I. GARCIA and M. LEIVA discussed having an upcoming Pasadena clique meeting at an unindicted co-conspirator's residence wherein defendants I. GARCIA and M. LEIVA agreed that no one would be assaulted.

Overt Act No. 165: On or about March 19, 2015, by telephone using coded language, defendants I. GARCIA and M. LEIVA discussed the Pasadena clique's extortionate rent payments to the Mexican Mafia and individual Pasadena clique members' dues, including who owed money and who was up to date.

Overt Act No. 166: On or about March 19, 2015, by telephone using coded language, defendant M. LEIVA told defendant I. GARCIA that defendant M. LEIVA hoped that the Pasadena clique could collect $1,000 so that the clique could buy some nice "pieces," which is coded language for firearms.

Overt Act No. 167: On or about March 19, 2015, by telephone using coded language, defendants I. GARCIA and M. LEIVA discussed that if Pasadena member "Triste" did not pay his extortionate rent payment, then Triste would be "courted," meaning that disciplinary action would be taken against him, including violence, or alternatively, he might be terminated from the Pasadena clique.

Overt Act No. 168:  On or about March 20, 2015, by telephone using coded language, defendant I. GARCIA and an unindicted co-conspirator discussed whether the Pasadena clique could have a gang meeting at the unindicted co-conspirator's house to talk about extortionate rent payments.

Overt Act No. 169:  On or about March 20, 2015, by telephone using coded language, defendants I. GARCIA and MARTINEZ confirmed the Pasadena clique meeting time.

Overt Act No. 170:  On or about March 20, 2015, by telephone using coded language, Perez and CHS-1 discussed the upcoming Adams clique meeting logistics.

Overt Act No. 171:  On or about March 20, 2015, by telephone using coded language, defendant I. GARCIA told CHS-1 that defendant I. GARCIA successfully paid the Pasadena clique extortionate rent payments to the Mexican Mafia representative.

Overt Act No. 172:  On or about March 21, 2015, by telephone using coded language, defendants I. GARCIA and MARTINEZ discussed the Pasadena clique meeting time for the next day.

Overt Act No. 173:  On or about March 21, 2015, by text message using coded language, defendant TORRES asked CHS-1 whether CHS-1 gave the Adams clique's rent money to an unindicted co-conspirator.

Overt Act No. 174:  On or about March 21, 2015, by telephone using coded language, defendant I. GARCIA called an unindicted co-conspirator and asked the unindicted co-conspirator to "grab the gun" that defendant I. GARCIA left in the kitchen.

Overt Act No. 175:  On or about March 22, 2015, defendants I. GARCIA, MARTINEZ, and an unindicted co-conspirator attended a Pasadena clique meeting at the unindicted co-conspirator's residence.

Overt Act No. 176:  On or about March 22, 2015, Perez and other unindicted co-conspirators attended an Adams clique meeting wherein the group discussed the Adams clique's annual extortionate rent payment.

Overt Act No. 177:  On or about March 22, 2015, defendant HERRERA attempted to extort victim M.A., owner of the Cali Viejo restaurant, located at 7363 Van Nuys Boulevard, Van Nuys, California ("Cali Viejo Restaurant"), located within MS-13 territory, by demanding that she pay defendant HERRERA "rent" money.

Overt Act No. 178:  On or about March 23, 2015, by telephone using coded language, Perez and CHS-1 discussed the Adams clique's extortionate rent payment.

Overt Act No. 179:  On or about March 23, 2015, by telephone using coded language, defendant I. GARCIA and CHS-1 discussed whether defendant I. GARCIA had a firearm available for purchase.

Overt Act No. 180:  On or about March 23, 2015, by telephone using coded language, defendant I. GARCIA told defendant M. LEIVA that defendant I. GARCIA was tending to his marijuana plants, clones that defendant I. GARCIA received from his cousin.

Overt Act No. 181:  On or about March 23, 2015, by telephone using coded language, defendant I. GARCIA asked an unindicted co-conspirator whether the unindicted co-conspirator would sell defendant I. GARCIA a firearm for which defendant I. GARCIA would pay top dollar.

Overt Act No. 182:  On or about March 23, 2015, by telephone using coded language, an unidentified co-conspirator told defendant I. GARCIA that the unidentified co-conspirator had five 9mm firearms and five .380 caliber firearms available for sale, to which defendant

1    I. GARCIA told the unidentified co-conspirator that defendant I.
2    GARCIA would pick up one of the 9mm firearms.

3        Overt Act No. 183:  On or about March 23, 2015, by telephone
4    using coded language, defendant I. GARCIA told CHS-1 that defendant
5    I. GARCIA located a 9mm handgun for the price of $500.

6        Overt Act No. 184:  On or about March 23, 2015, by telephone
7    using coded language, defendants I. GARCIA and M. LEIVA discussed the
8    March 22, 2015 Pasadena clique meeting, including the need to
9    "court," or assault, members who were not on time, which clique
10   members owed extortionate rent payments, having another mandatory
11   meeting, taking a trip to Northern California to consult with other
12   MS-13 members, talking to MS-13 members on the east coast, and
13   reprimanding members who do not respect and follow the rules.

14       Overt Act No. 185:  On or about March 23, 2015, defendant
15   HERRERA threw gang signs and threatened to kill victim R.S. at the
16   Cali Viejo restaurant, within MS-13's territory.

17       Overt Act No. 186:  On or about March 24, 2015, by text message
18   using coded language, defendant I. GARCIA and an unindicted co-
19   conspirator discussed whether defendant I. GARCIA could obtain
20   marijuana.

21       Overt Act No. 187:  On or about March 25, 2015, by telephone
22   using coded language, defendant Perez told CHS-1 that Perez was using
23   a middle-man for Perez's narcotics transactions, and then they
24   discussed a shooting between MS-13 and a rival gang wherein a
25   bystander was shot.

26       Overt Act No. 188:  On or about March 27, 2015, by telephone
27   using coded language, defendant I. GARCIA and an unindicted co-
28   conspirator discussed whether it was better for defendant I. GARCIA

to grow his marijuana plants with direct sunlight or in a room under a light bulb and discussed the status of defendant I. GARCIA's marijuana plants.

Overt Act No. 189:  On or about March 27, 2015, by telephone using coded language, CHS-1 told defendant TORRES that Perez had the Adams clique's rent money.

Overt Act No. 190:  On or about March 30, 2015, by telephone using coded language, an unindicted co-conspirator asked defendant I. GARCIA about the price for a pound of good marijuana, which defendant I. GARCIA said was expensive.

Overt Act No. 191:  On or about March 30, 2015, by telephone using coded language, defendant I. GARCIA called his marijuana supplier to confirm that the supplier could sell "top shelf" marijuana for the same price that defendant I. GARCIA paid the last time he purchased marijuana.  Defendant I. GARCIA told the unindicted co-conspirator that defendant I. GARCIA was growing marijuana plants outdoors, but his customer was looking for "top shelf" marijuana.

Overt Act No. 192:  On or about March 30, 2015, by telephone using coded language, defendant I. GARCIA told his marijuana customer that one pound of marijuana cost $2,400.

Overt Act No. 193:  On or about March 31, 2015, by telephone using coded language, defendant I. GARCIA and his marijuana customer discussed prices for "top shelf" marijuana.

Overt Act No. 194:  On or about April 1, 2015, by telephone using coded language, defendant I. GARCIA told an unindicted co-conspirator that some rival gang members were pointing firearms out of the windows of their vehicles and defendant I. GARCIA would have confronted them, but law enforcement was present in the area.

1    <u>Overt Act No. 195:</u>  On or about April 1, 2015, by telephone
2  using coded language, defendant I. GARCIA told an unindicted co-
3  conspirator that the rival gang members were going to get shot.

4    <u>Overt Act No. 196:</u>  On or about April 5, 2015, by telephone
5  using coded language, defendant TORRES told an unindicted co-
6  conspirator that there were three inmates arriving at the prison in
7  which defendant TORRES was housed with an "R," which stands for rape,
8  on their paperwork, who would be "taken out," meaning killed.

9    <u>Overt Act No. 197:</u>  On or about April 2, 2015, by telephone
10  using coded language, defendant I. GARCIA told a marijuana customer
11  that defendant I. GARCIA could sell the marijuana for $40.

12    <u>Overt Act No. 198:</u>  On or about April 3, 2015, by telephone
13  using coded language, defendant I. GARCIA told an unindicted co-
14  conspirator that defendant I. GARCIA just dropped off marijuana.

15    <u>Overt Act No. 199:</u>  On or about April 4, 2015, by telephone
16  using coded language, defendant I. GARCIA told a marijuana customer
17  that he could sell marijuana and meet up for the sale in a few
18  minutes.

19    <u>Overt Act No. 200:</u>  On or about April 5, 2015, by telephone
20  using coded language, defendant TORRES told an unindicted co-
21  conspirator that there were two people, M.V. and C.B., with "Rs" on
22  their paperwork, who would be "removed," meaning killed.

23    <u>Overt Act No. 201:</u>  On or about April 5, 2015, by telephone
24  using coded language, defendant TORRES and an unindicted co-
25  conspirator discussed killing the two inmates, M.V. and C.B., with
26  "Rs" on their paperwork and the unindicted co-conspirator told
27  defendant TORRES that the unindicted co-conspirator would inquire
28  with his neighborhood whether one of the intended victims should

avoid the penalty because the intended victim was from the unindicted co-conspirator's neighborhood.

Overt Act No. 202:   On or about April 5, 2015, by telephone using coded language, defendant TORRES asked CHS-1 to ask that Perez buy a PayPal card for the Adams clique's money and send it to defendant TORRES so that defendant TORRES could send it to the appropriate Mexican Mafia recipient.

Overt Act No. 203:   On or about April 5, 2015, by telephone using coded language, an unindicted co-conspirator told defendant TORRES that no one from the unindicted co-conspirator's clique knew M.V., so defendant TORRES had permission to do whatever he wanted to do to M.V., and defendant TORRES advised the unindicted co-conspirator that in the event defendant TORRES was removed to solitary confinement due to defendant TORRES' part in killing the two intended victims, that defendant TORRES had a replacement lined up.

Overt Act No. 204:   On or about April 6, 2015, by telephone using coded language, Perez and CHS-1 discussed the Adams clique's rent and how they did not want the rent to go missing as it did the year before.

Overt Act No. 205:   On or about April 7, 2015, by telephone using coded language, defendant I. GARCIA told defendant MARTINEZ that defendant MARTINEZ needed to retrieve a firearm from an unindicted co-conspirator.   Defendant MARTINEZ agreed to retrieve the firearm and said that he would store the firearm in his bedroom.

Overt Act No. 206:   On or about April 7, 2015, by telephone using coded language, defendants I. GARCIA and MARTINEZ discussed that when MS-13 members in the San Fernando Valley have problems, the MS-13 members in the San Fernando Valley should handle those

52

problems; and the two discussed the need for another mandatory gang meeting and having more "hits," twice per month.

Overt Act No. 207:  On or about April 7, 2015, by telephone using coded language, defendant TORRES identified to CHS-1 which Mexican Mafia brother to whom MS-13's rent would be paid.

Overt Act No. 208:  On or about April 7, 2015, by telephone using coded language, defendant TORRES told an unindicted co-conspirator that there must have been a "rat," meaning informant, in the prison facility wherein defendant TORRES was housed because the two intended victims, M.V. and C.B., were relocated to Administrative Segregation, and defendant TORRES was going to temporarily stop using his cellular telephone.

Overt Act No. 209:  On or about April 9, 2015, by telephone using coded language, defendants M. LEIVA and I. GARCIA discussed another mandatory meeting and that MS-13 members in the San Fernando Valley should handle their own problems.

Overt Act No. 210:  On or about April 9, 2015, by telephone using coded language, defendants M. LEIVA and I. GARCIA discussed that MS-13 will likely make defendants MARTINEZ and CORRALES put in work, referring to committing an act of violence on behalf of MS-13.

Overt Act No. 211:  On or about April 10, 2015, by telephone using coded language, defendant I. GARCIA told an unindicted co-conspirator that he would purchase 30 clone marijuana plants.

Overt Act No. 212:  On or about April 12, 2015, by telephone using coded language, a marijuana customer told defendant I. GARCIA that the marijuana customer saw on Facebook that defendant I. GARCIA sells marijuana and wanted to buy some; defendant I. GARCIA said he would give the marijuana customer a good price.

53

1   <u>Overt Act No. 213:</u>  On or about April 13, 2015, by telephone
2  using coded language, defendant MAXION told CHS-1 that the price per
3  ounce of methamphetamine was $400.

4   <u>Overt Act No. 214:</u>  On or about April 14, 2015, by telephone
5  using coded language, defendant MAXION asked CHS-1 whether CHS-1
6  still wanted the methamphetamine.

7   <u>Overt Act No. 215:</u>  On or about April 14, 2015, by telephone
8  using coded language, defendant MAXION told CHS-1 that defendant
9  MAXION had methamphetamine.

10   <u>Overt Act No. 216:</u>  On or about April 14, 2015, within MS-13
11  territory, defendant MAXION sold approximately 54.8 grams of
12  methamphetamine to CHS-1 for $800.

13   <u>Overt Act No. 217:</u>  On or about April 19, 2015, defendant
14  HERRERA attempted to gain entry to the Cali Viejo restaurant, within
15  MS-13 territory, by brandishing a firearm at victim D.C., threatening
16  D.C. that he would be "taken out," meaning killed, and announcing
17  that defendant HERRERA was from MS-13.

18   <u>Overt Act No. 218:</u>  On or about April 20, 2015, by telephone
19  using coded language, defendant I. GARCIA told CHS-1 that defendant
20  I. GARCIA had three different prices, including $300 per ounce, $500
21  per ounce, and $700 per ounce, depending on the quality of the
22  methamphetamine.

23   <u>Overt Act No. 219:</u>  On or about April 20, 2015, by telephone
24  using coded language, defendants M. LEIVA and I. GARCIA discussed
25  other Pasadena clique members' disappointment that the Pasadena
26  clique meeting planned for April 19, 2015 was cancelled, that an
27  unindicted co-conspirator needed to be present at the meetings
28  because the unindicted co-conspirator "has the numbers," referring to

the list of members who have/have not paid their extortion payments, and that everyone in the Pasadena clique must participate and cannot simply claim MS-13 membership.

Overt Act No. 220:  On or about April 22, 2015, by telephone using coded language, defendants I. GARCIA and M. LEIVA discussed that defendant CORRALES was disrespectful with another Pasadena member's girlfriend and that, as a result, defendant CORRALES should be beaten for 26 seconds.

Overt Act No. 221:  On or about April 22, 2015, by telephone using coded language, defendants I. GARCIA and MARTINEZ discussed whether members of the Pasadena clique were going to an unindicted co-conspirator's residence to "court," or assault, defendant CORRALES.

Overt Act No. 222:  On or about April 23, 2015, by telephone using coded language, defendant MAXION told CHS-1 that defendant MAXION had the methamphetamine for their narcotics transaction.

Overt Act No. 223:  On or about April 23, 2015, within MS-13 territory, defendant MAXION sold approximately 54.9 grams of methamphetamine to CHS-1 for $800.

Overt Act No. 224:  On or about April 24, 2015, by telephone using coded language, defendants M. LEIVA and I. GARCIA discussed disciplining defendant CORRALES for violating MS-13's code of conduct.

Overt Act No. 225:  On or about April 28, 2015, Ramirez met with CHS-1, who asked Ramirez whether Ramirez could supply CHS-1 with two to three ounces of methamphetamine, and Ramirez told CHS-1 that was a lot to ask of defendant Ramirez's supplier and said Ramirez would get back to CHS-1.

<u>Overt Act No. 226:</u>  On or about April 30, 2015, CHS-1 met with Perez, who advised CHS-1 that Ramirez did not want to conduct narcotics transactions with CHS-1 because of CHS-1's connections to the Mexican Mafia.

<u>Overt Act No. 227:</u>  On or about May 1, 2015, by telephone using coded language, defendants M. LEIVA and I. GARCIA discussed law enforcement's execution of search warrants at two locations, and defendant I. GARCIA asked defendant M. LEIVA to contact the Pasadena clique secretary to inquire how much money the Pasadena clique had in case bail money was necessary.

<u>Overt Act No. 228:</u>  On or about May 3, 2015, defendants I. GARCIA, CORRALES, Perez, and other Pasadena clique members attended a Pasadena clique meeting.

<u>Overt Act No. 229:</u>  On or about May 3, 2015, by telephone using coded language, defendants M. LEIVA and I. GARCIA discussed the traffic stops after the May 3, 2015 Pasadena clique meeting and defendant M. LEIVA told defendant I. GARCIA that he was going to change his telephone number.

<u>Overt Act No. 230:</u>  On or about May 3, 2015, by telephone using coded language, defendant I. GARCIA told defendant MARTINEZ about the traffic stops after the May 3, 2015 Pasadena clique meeting.

<u>Overt Act No. 231:</u>  On or about May 4, 2015, by telephone using coded language, defendant ZEPEDA told CHS-1 that defendant ZEPEDA had four ounces of methamphetamine available for CHS-1 to purchase.

<u>Overt Act No. 232:</u>  On or about May 5, 2015, by telephone using coded language, defendant ZEPEDA asked CHS-1 how many ounces of methamphetamine CHS-1 wanted and CHS-1 told defendant ZEPEDA that CHS-1 wanted three ounces of methamphetamine.

1    <u>Overt Act No. 233</u>:  On or about May 5, 2015, within MS-13

2    territory, defendant ZEPEDA sold approximately 84.2 grams of

3    methamphetamine to CHS-1 for $1,100.

4    <u>Overt Act No. 234</u>:  On or about May 22, 2015, Gonzalez spray-

5    painted "MS" along the wall of a building located at 3055 W. 7th

6    Street, Los Angeles, California, within MS-13 territory.

7    <u>Overt Act No. 235</u>:  On or about May 25, 2015, defendant VIDES

8    stood next to an unindicted co-conspirator, who spray-painted "MS" on

9    a wall near the intersection of Beverly Boulevard and Rampart in Los

10   Angeles, California, within MS-13 territory.

11   <u>Overt Act No. 236</u>:  On or about May 25, 2015, defendant VIDES

12   drove a vehicle that contained a blue steel revolver.

13   <u>Overt Act No. 237</u>:  On or about June 10, 2015, by telephone

14   using coded language, Perez and CHS-1 discussed the Adams clique's

15   rent money in advance of the June 14, 2015 MS-13 general meeting.

16   <u>Overt Act No. 238</u>:  On or about June 12, 2015, by telephone

17   using coded language, defendant ZEPEDA and CHS-1 discussed the

18   upcoming MS-13 general meeting, and defendant ZEPEDA told CHS-1 that

19   defendant ZEPEDA would be in touch with CHS-1 the next day.

20   <u>Overt Act No. 239</u>:  On or about June 13, 2015, by telephone

21   using coded language, defendant JOHN GARCIA told CHS-1 that defendant

22   JOHN GARCIA would attend MS-13's general meeting.

23   <u>Overt Act No. 240</u>:  On or about June 14, 2015, by telephone

24   using coded language, Perez asked CHS-1 for the address and room

25   number of the MS-13 general meeting.

26   <u>Overt Act No. 241</u>:  On or about June 14, 2015, defendants

27   LEVERON, JOHN GARCIA, ARDOIN, and Perez and other unindicted co-

28   conspirators, attended an MS-13 leadership meeting wherein defendant

LEVERON and defendant JOHN GARCIA discussed which Mexican Mafia brother to whom MS-13 was paying its taxes; defendant JOHN GARCIA discussed membership in the Junior Mara gang; defendant JOHN GARCIA said that MS-13 voted for him to take the overall leadership position for MS-13 and that he wanted to have a group ("mesa") run MS-13; defendant JOHN GARCIA announced that defendant LEVERON was the Hollywood clique's shot caller and that Perez was the Adams clique's shot caller; defendant LEVERON argued that incarcerated MS-13 members should not run MS-13 on the street, but that MS-13 members on the street should run MS-13 and each clique should decide; defendant JOHN GARCIA warned all MS-13 members in attendance to be careful using cellular telephones; defendant ARDOIN discussed the issues surrounding defendant VIDES, who said that he wanted defendant ARDOIN dead; and defendant ARDOIN announced that he had "the vote" to slash defendant VIDES' face.

Overt Act No. 242: On or about June 24, 2015, an unindicted co-conspirator, who was the secretary of the Pasadena clique, possessed, in her residence, a pay/owe sheet with defendant I. GARCIA's name and telephone number; letters from incarcerated MS-13 members; jail booking information for incarcerated and/or arrested MS-13 members; a book titled "Gangsters Without Borders—An Ethnography of a Salvadoran Street Gang"; a small notebook containing MS-13 members' monikers and how much money each owed; a photo album containing numerous photographs of individuals displaying gang signs and a news article about MS-13; numerous pay/owe sheets with names and amounts owed by MS-13 members, including defendants I. GARCIA, CORRALES, and MARTINEZ; and a photograph of an unknown man with a large MS-13 tattoo on his torso.

Overt Act No. 243:  On or about June 25, 2015, by telephone using coded language, defendant JOSE GARCIA asked CHS-1 how to contact defendant JOHN GARCIA so that defendant JOSE GARCIA could get "up to date" with MS-13 business.

Overt Act No. 244:  On or about July 10, 2015, by telephone using coded language, defendant JOHN GARCIA and CHS-1 agreed to meet at a Kentucky Fried Chicken in Los Angeles, California, located within MS-13 territory.

Overt Act No. 245:  On or about July 10, 2015, in person and by telephone using coded language, defendant JOHN GARCIA, CHS-1 and an incarcerated unindicted co-conspirator spoke about the state of MS-13 Los Angeles, and defendant JOHN GARCIA running all of MS-13, where defendant JOHN GARCIA advised that he thought it best to have a group of MS-13 members running MS-13 Los Angeles, not just one person.

Overt Act No. 246:  On or about July 10, 2015, defendants JOHN GARCIA and JOSE GARCIA met within MS-13 territory and discussed running MS-13.

Overt Act No. 247:  On or about July 10, 2015, by telephone using coded language, defendant JOHN GARCIA told CHS-1 that defendant JOHN GARCIA met with defendant JOSE GARCIA to discuss running all of MS-13 Los Angeles with defendant JOHN GARCIA.

Overt Act No. 248:  On or about July 10, 2015, by text message using coded language, Perez told CHS-1 that Perez had money for the Adams clique's dues.

Overt Act No. 249:  On or about July 27, 2015, by telephone using coded language, Perez asked CHS-1 whether there was an upcoming MS-13 general meeting.

Overt Act No. 250:  On or about August 3, 2015, by telephone using coded language, defendant JOSE GARCIA and CHS-1 discussed which Mexican Mafia brother defendant JOSE GARCIA and his clique, Coronado, were working for, and whether CHS-1 could help defendant JOSE GARCIA obtain a firearm.

Overt Act No. 251:  On or about August 3, 2015, by telephone using coded language, defendant ZEPEDA told CHS-1 that defendant ZEPEDA had various narcotics available for purchase, as well as a good connection by which to obtain cellular telephones.

Overt Act No. 252:  On or about August 7, 2015, by telephone using coded language, an incarcerated unindicted co-conspirator told CHS-1 that Perez should be beaten for failing to pay MS-13's rent to the Mexican Mafia.

Overt Act No. 253:  On or about August 9, 2015, defendants VILLALOBOS, S. RIVAS, and other unindicted co-conspirators from the Fulton clique, went to the Cali Viejo Restaurant, within MS-13 Hollywood territory, wherein defendant VILLALOBOS asked an unindicted co-conspirator to challenge two rival gang members in the restaurant.

Overt Act No. 254:  On or about August 9, 2015, defendant VILLALOBOS told an unindicted co-conspirator to grab a backpack, which defendant VILLALOBOS knew contained a firearm, from a table at the Cali Viejo Restaurant.

Overt Act No. 255:  On or about August 9, 2015, using coded language, an unindicted co-conspirator told another unindicted co-conspirator to get a firearm from a backpack the other unindicted co-conspirator was holding and to give it to the unindicted co-conspirator; the other unindicted co-conspirator opened the backpack,

1  retrieved a firearm, and handed the firearm to the unindicted co-
2  conspirator.

3      <u>Overt Act No. 256:</u>  On or about August 9, 2015, within MS-13
4  territory, an unindicted co-conspirator chased R.B. out of the Cali
5  Viejo Restaurant and shot R.B. in the back approximately three times.

6      <u>Overt Act No. 257:</u>  On or about August 12, 2015, by telephone
7  using coded language, defendant JOSE GARCIA and CHS-1 discussed the
8  boundary dispute between the Coronado and Leeward cliques.

9      <u>Overt Act No. 258:</u>  On or about August 12, 2015, by telephone
10  using coded language, defendant LEVERON asked CHS-1 when the next MS-
11  13 general meeting would take place.

12      <u>Overt Act No. 259:</u>  On or about August 13, 2015, by telephone
13  using coded language, defendant JOSE GARCIA and CHS-1 discussed the
14  next mandatory MS-13 general meeting.

15      <u>Overt Act No. 260:</u>  On or about August 14, 2015, by telephone
16  using coded language, Perez told CHS-1 that Perez spoke with
17  defendant JOSE GARCIA about the need for another MS-13 general
18  meeting.

19      <u>Overt Act No. 261:</u>  On or about August 15, 2015, defendants
20  VILLALOBOS, C. LOPEZ, and S. RIVAS, and other Fulton clique members,
21  traveled to the Little San Salvador Nightclub and Restaurant located
22  at 901 North Western Avenue, Los Angeles, California ("L.S.S."),
23  which is in the Hollywood clique's territory, where defendant LEVERON
24  was dining.

25      <u>Overt Act No. 262:</u>  On or about August 15, 2015, at the L.S.S.,
26  within MS-13 territory, defendant S. RIVAS challenged E.M., H.M., and
27  S.B., by asking them which gang they were from.

28

1    <u>Overt Act No. 263:</u>  On or about August 15, 2015, at the L.S.S.,

2  defendant C. LOPEZ murdered E.M. by shooting E.M. approximately five

3  times.

4    <u>Overt Act No. 264:</u>  On or about August 15, 2015, defendants

5  VILLALOBOS and C. LOPEZ had telephonic contact just after defendant

6  C. LOPEZ shot and killed E.M.

7    <u>Overt Act No. 265:</u>  On or about August 15, 2015, at the L.S.S.,

8  within MS-13 territory, defendant LEVERON attempted to murder H.M.

9  and S.B.

10   <u>Overt Act No. 266:</u>  On or about August 15, 2015, at the L.S.S.,

11  within MS-13 territory, defendant S. RIVAS threatened to kill H.M.

12  and J.E.

13   <u>Overt Act No. 267:</u>  On or about August 15, 2015, members of the

14  Fulton clique and a confidential informant acting at the direction of

15  law enforcement ("CHS-7") met at a park in the San Fernando Valley,

16  where defendant C. LOPEZ told the group that he was the shooter at

17  the L.S.S.

18   <u>Overt Act No. 268:</u>  On or about August 30, 2015, an unindicted

19  co-conspirator handed defendant S. RIVAS a firearm, and defendant S.

20  RIVAS shot and killed victim D.G., a rival gang member, outside of a

21  business located at 8700 Woodman Avenue, Panorama City, California.

22   <u>Overt Act No. 269:</u>  On or about August 30, 2015, defendant

23  VILLALOBOS was within one block of the location where defendants S.

24  RIVAS and an unindicted co-conspirator killed victim D.G. at or about

25  the time of the murder.

26   <u>Overt Act No. 270:</u>  On or about September 1, 2015, by telephone

27  using coded language, defendant LEVERON told CHS-1 that defendant

28  LEVERON had been unable to call CHS-1 because defendant LEVERON was

the subject of law enforcement's attention, and the two discussed the August 15, 2015 shooting and stabbings that occurred in the Hollywood clique's territory.

Overt Act No. 271:  On or about September 2, 2015, defendants CORRALES and MARTINEZ shot J.A. two times.

Overt Act No. 272:  On or about September 6, 2015, using coded language, defendants VILLALOBOS and S. RIVAS exchanged a series of text messages whereby defendant S. RIVAS asked defendant VILLALOBOS for permission to remove rival Pacoima gang members from the shopping center located at 8700 Woodman Avenue, Panorama City, California, where defendant S. RIVAS shot and killed D.G., a rival Pacoima gang member, on August 30, 2015.

Overt Act No. 273:  On or about September 8, 2015, defendant E. RIVAS mailed a parcel containing approximately 218.3 grams of methamphetamine from his residence in Los Angeles, California, to fellow Park View clique members at an address in Houston, Texas.

Overt Act No. 274:  On or about September 16, 2015, by text message using coded language, Ramos sent CHS-1 photographs of MS-13 graffiti wherein Coronado and Leeward clique graffiti was crossed out due to a territorial dispute.

Overt Act No. 275:  On or about September 16, 2015, by telephone using coded language, Ramos and CHS-1 discussed the dispute between the Coronado and Leeward cliques, and Ramos admitted being present when defendant VIDES was informed he would be disciplined for chasing down a Leeward clique member with a firearm.

Overt Act No. 276:  On or about September 27, 2015, by telephone using coded language, Ramos told CHS-1 that Ramos received the address for the upcoming MS-13 general meeting.

1    Overt Act No. 277:  On or about September 27, 2015, by telephone
2    using coded language, Ramos expressed concern to CHS-1 about police
3    presence and surveillance cameras in the area of the MS-13 general
4    meeting.

5    Overt Act No. 278:  On or about September 27, 2015, defendants
6    MELGAR, JOSE GARCIA, MARTINEZ, and E. RIVAS, and Ramos and Perez, as
7    well as several unindicted co-conspirators, attended an MS-13 general
8    meeting.

9    Overt Act No. 279:  On or about September 27, 2015, at the MS-13
10   general meeting, an unindicted co-conspirator demanded that defendant
11   VIDES receive a beating as discipline for tagging "Coronado" in
12   Leeward clique's territory and pulling a firearm on another MS-13
13   member.

14   Overt Act No. 280:  On or about September 27, 2015, at the MS-13
15   general meeting, defendant JOSE GARCIA explained to the other MS-13
16   attendees that MS-13 is one gang and not defined by its individual
17   cliques.

18   Overt Act No. 281:  On or about September 27, 2015, at the MS-13
19   general meeting, defendant MELGAR reminded the MS-13 attendees that
20   the boundary dispute between the Coronado and Leeward cliques was
21   discussed three years earlier.

22   Overt Act No. 282:  On or about September 27, 2015, at the MS-13
23   general meeting, an unindicted co-conspirator attempted to mediate
24   the territorial boundary dispute between the Coronado and Leeward
25   cliques.

26   Overt Act No. 283:  On or about September 27, 2015, at the MS-13
27   general meeting, defendant MELGAR explained that the boundary dispute
28

1  needed to be resolved to avoid another war among the Coronado and
2  Leeward cliques.

3      Overt Act No. 284:  On or about September 27, 2015, at the MS-13
4  general meeting, defendant MELGAR explained that the Coronado and
5  Leeward cliques did not get along because Coronado clique members
6  have killed two Leeward clique members.

7      Overt Act No. 285:  On or about September 27, 2015, at the MS-13
8  general meeting, an unindicted co-conspirator announced the consensus
9  that the Coronado clique should follow the agreement and accept the
10 boundaries that had been in place for a number of years.

11     Overt Act No. 286:  On or about September 27, 2015, at the MS-13
12 general meeting,  argued for the Leeward clique's continued control
13 over a particular intersection in the Leeward clique's territory,
14 where Leeward clique members had been selling narcotics for years.
15 Ramos reminded the MS-13 members in attendance that Leeward clique
16 members had killed people over the Leeward clique's control of the
17 streets in their territory.

18     Overt Act No. 287:  On or about September 27, 2015, at the MS-13
19 general meeting, Ramos told the MS-13 members in attendance that the
20 Leeward clique had lent other MS-13 members firearms in the past.

21     Overt Act No. 288:  On or about September 27, 2015, at the MS-13
22 general meeting, an unindicted co-conspirator discussed the cliques
23 that were up to date on rent payments and the cliques that owed
24 money.

25     Overt Act No. 289:  On or about September 27, 2015, at the MS-13
26 general meeting, defendant MELGAR and Ramos, and an unindicted co-
27 conspirator nominated CHS-1 to collect all of the MS-13's clique's
28 rent payments.

Overt Act No. 290:  On or about September 27, 2015, at a park in San Fernando, California, within MS-13 territory, defendants VILLALOBOS and MOLINA met with confidential informant acting at the direction of law enforcement ("CHS-6"), and they discussed that the Fulton clique had a greenlight on an MS-13 member, "Bala," which meant that any MS-13 member could locate and kill "Bala"; that CHS-6 knew of a "Bala" on the East Coast; concerns about defendant JOHN GARCIA being the shot caller of the Hollywood clique; that a Fulton clique member owed defendant LEVERON approximately $30,000; and that if the Fulton clique member did not repay defendant LEVERON, then defendant LEVERON would kill the Fulton clique member.

Overt Act No. 291:  On or about September 27, 2015, by telephone using coded language, defendant MOLINA asked CHS-6 whether CHS-6 could provide a photograph of the person named "Bala" from the East Coast to determine if the person CHS-6 knew as "Bala" was the same "Bala" on which the Fulton clique had a greenlight.  CHS-6 told defendant MOLINA that CHS-6 could obtain a photograph of the East Coast "Bala" within ten minutes.

Overt Act No. 292:  On or about September 27, 2015, by telephone using coded language, defendant MOLINA told CHS-6 that defendant MOLINA needed to meet with CHS-6 so that defendant MOLINA could view the photograph of "Bala" obtained by CHS-6.

Overt Act No. 293:  On or about September 27, 2015, defendant MOLINA, along with defendant VILLALOBOS and another individual, drove to 11820 Kittridge Street, North Hollywood, California, to meet with CHS-6 to discuss MS-13 business and view the photograph of "Bala."

Overt Act No. 294:  On or about September 27, 2015, defendant MOLINA shot and killed victim J.R. in front of a residence located at 11820 Kittridge Street, North Hollywood, California.

Overt Act No. 295:  On or about September 27, 2015, at or about the time defendant MOLINA killed victim J.R. in North Hollywood, California; defendant VILLALOBOS was present.

Overt Act No. 296:  On or about September 29, 2015, by telephone using coded language, defendant LEVERON told CHS-6 that defendant LEVERON wanted to take CHS-6 to a Salvadoran restaurant; CHS-6 agreed to meet defendant LEVERON at the restaurant and defendant LEVERON said he was already at the restaurant.

Overt Act No. 297:  On or about September 29, 2015, at the Jaragua restaurant in Hollywood, California, within MS-13 territory ("Jaragua Restaurant"), defendant LEVERON introduced defendant ZEPEDA to CHS-6 as the supplier of narcotics to Virginia, and they discussed having CHS-6 organize narcotics distribution on the East Coast, with defendant ZEPEDA acting as the wholesale supplier and defendant LEVERON receiving a brokerage fee.

Overt Act No. 298:  On or about September 29, 2015, at the Jaragua Restaurant, defendant LEVERON told CHS-6 that the Los Angeles Hollywood clique's main revenue stream was collecting extortionate rent payments from local businesses and that the Hollywood clique nets approximately $9,000 per month.

Overt Act No. 299:  On or about September 29, 2015, at the Jaragua Restaurant, defendant LEVERON told CHS-6 that Fulton clique members came to his neighborhood, started a fight, began stabbing people, shot and killed someone, and as a result, defendant LEVERON had to take out his knife and "act."

1    Overt Act No. 300:  On or about September 29, 2015, by

2    telephone, using coded language, defendant LEVERON told CHS-6 that

3    the Fulton clique members were acting "dumb" because of the money

4    they owed, which defendant LEVERON said was $4,000.

5        Overt Act No. 301:  On or about October 30, 2015, defendant

6    ARENAS possessed a Rock Island Armory .38 caliber revolver, bearing

7    serial number RIA1422718, and nine rounds of .38 caliber ammunition.

8        Overt Act No. 302:  On or about November 7, 2015, defendant C.

9    LOPEZ gave defendant DUARTE the Ruger .38 caliber revolver that C.

10   LOPEZ used to shoot E.M. at the L.S.S. on August 15, 2015.

11       Overt Act No. 303:  On or about November 10, 2015, defendant

12   DUARTE gave an unindicted co-conspirator a firearm that the

13   unindicted co-conspirator used to shoot at a rival gang member, but

14   actually shot an innocent bystander's vehicle, in the area of Vanowen

15   Street and Fulton Avenue in North Hollywood, California, within MS-13

16   territory.

17       Overt Act No. 304:  On or about November 11, 2015, defendant

18   DUARTE possessed the Ruger .38 caliber revolver that defendant C.

19   LOPEZ used to shoot E.M. at the L.S.S. on August 15, 2015.

20       Overt Act No. 305:  On or about February 27, 2016, defendant

21   MELGAR conducted a meeting with defendant M. LEIVA, Ramos, and,

22   several other unindicted co-conspirators, at the MS-13-run casita

23   managed by defendants L. LOPEZ, CARRANZA, and B. LEIVA, located at

24   3170 West Pico Boulevard, Los Angeles, California ("Pico Casita"),

25   within MS-13 territory, to request the discipline of a fellow MS-13

26   member who robbed the Pico Casita, stealing money and narcotics.

27       Overt Act No. 306:  On or about April 15, 2016, defendant L.

28   LOPEZ paid defendant MELGAR $500 to operate the Pico Casita.

Overt Act No. 307:  On or about April 16, 2016, defendant L. LOPEZ asked CHS-4 to help defendant L. LOPEZ break up and package approximately one ounce of methamphetamine for distribution to Pico Casita customers.

Overt Act No. 308:  On or about April 18, 2016, defendant MELGAR went to the Pico Casita to collect the weekly rent payment of $300 that defendant L. LOPEZ paid to defendant MELGAR to maintain and run the Pico Casita.

Overt Act No. 309:  On or about April 19, 2016, CHS-4 met with defendant L. LOPEZ at the Pico Casita and discussed the price that defendant MELGAR charged for two ounces of methamphetamine.

Overt Act No. 310:  On or about April 21, 2016, at the Pico Casita, within MS-13 territory, defendant MELGAR sold approximately 53.1 grams of methamphetamine to CHS-4 for $700.

Overt Act No. 311:  On or about April 28, 2016, at the Pico Casita, within MS-13 territory, defendant MELGAR sold approximately 53.9 grams of methamphetamine to CHS-4 for $700.

Overt Act No. 312:  On or about May 4, 2016, at the Pico Casita, within MS-13 territory, defendant L. LOPEZ sold approximately 1.31 grams of methamphetamine to a confidential informant acting at the direction of law enforcement ("CHS-5") for $60.

Overt Act No. 313:  On or about June 10, 2016, within MS-13 territory, defendants MELGAR, L. LOPEZ, CARRANZA, and B. LEIVA operated, managed, patrolled, and supervised the Pico Casita, for more than 30 days at a time, wherein narcotics and alcohol were served to paying customers and gambling, including dice, percentage games played with cards, and selling chances were engaged in by casita customers.  With respect to the gambling at the Pico casita,

69

defendant L. LOPEZ collected a percentage of the winnings of each round of cards and dice.

Overt Act No. 314:  On or before June 10, 2016, within MS-13 territory, defendant MELGAR sold approximately one ounce of actual methamphetamine to defendant L. LOPEZ for purposes of supplying the Pico Casita with methamphetamine.

Overt Act No. 315:  On or about June 11, 2016, within MS-13 territory, defendants L. LOPEZ, CARRANZA, and B. LEIVA were managing the Pico Casita, where law enforcement found approximately 25.4 grams of methamphetamine and approximately 37.4 grams of marijuana.

Overt Act No. 316:  On or about August 4, 2016, defendant MELGAR told CHS-4 that, if CHS-4 opened another casita, CHS-4 should ensure that the casita was located within Normandie clique territory, so that defendant MELGAR could collect extortionate rent payments from it.

Overt Act No. 317:  On or about August 14, 2016, at a park located at Whitsett Avenue and Sherman Way, North Hollywood, California, within MS-13 territory, defendant VILLALOBOS told CHS-7 that defendant S. RIVAS sold the firearm defendant S. RIVAS used to shoot D.G. on August 30, 2015 to an unindicted co-conspirator and that defendant VILLALOBOS told the unindicted co-conspirator to lose the firearm because it was "hot," meaning used in a homicide.

Overt Act No. 318:  On or about October 4, 2016, within MS-13 territory, defendant CARRANZA possessed a Smith & Wesson, model 66, .357 Revolver, bearing serial number 7K14944.

Overt Act No. 319:  On or about November 1, 2016, at an MS-13 run casita, located at 1960 S. Normandie Avenue, Los Angeles,

California ("Normandie Casita"), within MS-13 territory, defendant B. LEIVA possessed a revolver and a semi-automatic handgun.

Overt Act No. 320:  On or about November 7, 2016, within MS-13 territory, defendant CARRANZA served as a security guard and lookout for the Normandie Casita.

Overt Act No. 321:  On or about November 19, 2016, within MS-13 territory, defendants CARRANZA, B. LEIVA, and ARENAS managed the Normandie Casita, where law enforcement found approximately 19.92 grams of methamphetamine, approximately 0.4 grams of cocaine, digital scales, drug paraphernalia, numerous firearms, including a Glock 26, pistol, a Rossi, .38 special Revolver, a Smith & Wesson, model M&P 15 rifle, and a Crossman Arms shotgun, and more than 100 rounds of ammunition.

Overt Act No. 322:  On and before November 19, 2016, defendants CARRANZA, B. LEIVA, and ARENAS operated, managed, patrolled, and supervised the Normandie Casita, for more than 30 days at a time, wherein narcotics and alcohol were served to paying customers and gambling, including dice, percentage games played with cards, and selling chances were engaged in by casita customers.  With respect to the gambling at the Normandie casita, defendant L. LOPEZ collected a percentage of the winnings of each round of cards and dice.

Overt Act No. 323:  On or about December 27, 2016, within MS-13 territory, at a casita controlled by defendant MAXION where Normandie and Park View clique graffiti was written on the walls, defendant MAXION possessed a stolen iPad logged into defendant MAXION's Facebook page with user name "Mara Normandie Max" with a photograph of defendant MAXION, a JPL Identification Card that belonged to the owner of the iPad, a Ruger, model MK II, .22 caliber pistol, bearing

serial number 213-66999, and an Iver Johnsons Arms, .32 caliber revolver, bearing no serial number, as well as assorted ammunition, credit cards, personal checks, and social security cards in other peoples' names.

Overt Act No. 324: On or about January 29, 2017, defendant MOLINA possessed a Kahr Arms - Auto Ordnance, model PM9, 9mm pistol, bearing serial number IA2117.

D.   NOTICE OF SPECIAL ALLEGATIONS

The Grand Jury further alleges that:

1.   Beginning on a date unknown and continuing to on or about May 10, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, JOHN GARCIA, I. GARCIA, ARDOIN, TORRES, CORRALES, MARTINEZ, ZEPEDA, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, RAMIREZ, E. RIVAS, and M. LEIVA, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly, and intentionally possess with intent to distribute, and distribute at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

2.   On or about April 5, 2015, in Los Angeles County, within the Central District of California, defendant TORRES, and others known and unknown to the Grand Jury, conspired to murder M.V., with malice aforethought, in violation of California Penal Code Sections 182, 187, and 189.

3.   On or about April 5, 2015, in Los Angeles County, within the Central District of California, defendant TORRES, and others known and unknown to the Grand Jury, conspired to murder C.B., with

malice aforethought, in violation of California Penal Code Sections
182, 187, and 189.

4.   On or about August 9, 2015, in Los Angeles County, within
the Central District of California, defendant VILLALOBOS, and others
known and unknown to the grand jury, willfully, deliberately, and
with premeditation, unlawfully attempted to murder R.B., in violation
of California Penal Code Sections 21a, 31, 187, 189, and 664.

5.   On or about August 15, 2015, in Los Angeles County, within
the Central District of California, defendant C. LOPEZ, and others
known and unknown to the Grand Jury, willfully, deliberately, and
with premeditation, unlawfully killed with malice aforethought E.M.,
in violation of California Penal Code Sections 31, 187, and 189.

6.   On or about August 15, 2015, in Los Angeles County, within
the Central District of California, defendant LEVERON, willfully,
deliberately, and with premeditation, unlawfully attempted to murder
S.B., in violation of California Penal Code Sections 21a, 31, 187,
189, and 664.

7.   On or about August 15, 2015, in Los Angeles County, within
the Central District of California, defendant LEVERON, willfully,
deliberately, and with premeditation, unlawfully attempted to murder
H.M., in violation of California Penal Code Sections 21a, 31, 187,
189, and 664.

8.   On or about August 30, 2015, in Los Angeles County, within
the Central District of California, defendant S. RIVAS, and others
known and unknown to the Grand Jury, willfully, deliberately, and
with premeditation, unlawfully killed with malice aforethought D.G.,
in violation of California Penal Code Sections 31, 187, and 189.

1        9.    On or about September 27, 2015, in Los Angeles County,

2  within the Central District of California, defendant MOLINA, and

3  others known and unknown to the Grand Jury, willfully, deliberately,

4  and with premeditation, unlawfully killed with malice aforethought

5  J.R., in violation of California Penal Code Sections 31, 182, 187,

6  and 189.

COUNT TWO

[18 U.S.C. § 1959(a)(4)]

1. At all times relevant to this Indictment, MS-13, as described more particularly in Paragraphs 1 through 23 of the General Allegations, which paragraphs are re-alleged and incorporated by reference as if fully set forth herein, including its leaders, members, and associates, constitutes an enterprise, as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact which was engaged in, and the activities of which affect, interstate and foreign commerce. The enterprise constitutes an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2. At all times relevant to this Indictment, MS-13, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is multiple acts involving:

a. Murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, 190, and 664;

b. Extortion, in violation of California Penal Code Sections 31, 182, 518, 519, 520, and 664;

c. Robbery, in violation of California Penal Code Sections 31, 182, 211, 212, 212.5, 213, and 664;

d. Multiple offenses involving trafficking in controlled substances, including methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846;

1       e.   Multiple acts indictable under Title 18, United States

2  Code, Section 1955 (relating to the prohibition of illegal gambling

3  businesses); and

4       f.   Multiple acts indictable under Title 18, United States

5  Code, Section 1344 (relating to financial institution fraud).

6     3.   On or about March 23, 2015, in Los Angeles County, within

7  the Central District of California, for the purpose of maintaining

8  and increasing position in MS-13, an enterprise engaged in

9  racketeering activity, defendant JUAN CARLOS HERRERA, also known as

10  ("aka") "Diablo," aka "Bicho," threatened to commit a crime of

11  violence, that is, threatened to murder R.S., in violation of

12  California Penal Code Section 422.

COUNT THREE

[18 U.S.C. § 1959(a)(4)]

1.    Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about March 23, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant JUAN CARLOS HERRERA, also known as ("aka") "Diablo," aka "Bicho," threatened to commit a crime of violence, that is, threatened to murder R.S., in violation of California Penal Code Section 422.

COUNT FOUR

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    Beginning on a date unknown and continuing to on or about April 5, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant HENRY TORRES, also known as ("aka") "Jeovanny Sandoval," aka "Guanaco," aka "Lil Guapo," aka "Churro," and others known and unknown to the Grand Jury, conspired to murder M.V., in violation of California Penal Code Sections 182, 187, and 189.

COUNT FIVE

[18 U.S.C. § 1959(a)(5)]

1.     Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.     Beginning on a date unknown and continuing to on or about April 5, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant HENRY TORRES, also known as ("aka") "Jeovanny Sandoval," aka "Guanaco," aka "Lil Guapo," aka "Churro," and others known and unknown to the Grand Jury, conspired to murder C.B., in violation of California Penal Code Sections 182, 187, and 189.

COUNT SIX

[18 U.S.C. § 1959(a)(4)]

1.    Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about April 19, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant JUAN CARLOS HERRERA, also known as ("aka") "Diablo," aka "Bicho," threatened to commit a crime of violence, that is, threatened to murder D.C., in violation of California Penal Code Section 422.

COUNT SEVEN

[18 U.S.C. §§ 1959(a)(5), 2(a)]

1.   Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.   On or about August 9, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant MOISES VILLALOBOS, also known as ("aka") "Guerillero," and an unindicted co-conspirator, each aiding and abetting the other, willfully, deliberately, and with premeditation, unlawfully attempted to murder R.B., in violation of California Penal Code Sections 21a, 31, 187, 189, and 664.

COUNT EIGHT

[18 U.S.C. § 1959(a)(1)]

1.      Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.      On or about August 15, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant CARLOS ALFREDO CARDOZA LOPEZ, also known as "Little Boy," unlawfully and knowingly, with malice aforethought, murdered E.M., in violation of California Penal Code Sections 31, 187, and 189.

COUNT NINE

[18 U.S.C. § 1959(a)(5)]

1.     Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.     On or about August 15, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant ROBERTO MEJIA LEVERON, also known as "Chacal," willfully, deliberately, and with premeditation, unlawfully attempted to murder S.B., in violation of California Penal Code Sections 21a, 31, 187, 189, and 664.

COUNT TEN

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about August 15, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant ROBERTO MEJIA LEVERON, also known as "Chacal," willfully, deliberately, and with premeditation, unlawfully attempted to murder H.M., in violation of California Penal Code Sections 21a, 31, 187, 189, and 664.

COUNT ELEVEN

[18 U.S.C. § 1959(a)(4)]

1.    Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about August 15, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant SAMUEL ALEXANDER PAREDES RIVAS, also known as "Blacky," threatened to commit a crime of violence, that is, threatened to murder J.E., in violation of California Penal Code Section 422.

COUNT TWELVE

[18 U.S.C. § 1959(a)(4)]

3.    Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

4.    On or about August 15, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant SAMUEL ALEXANDER PAREDES RIVAS, also known as "Blacky," threatened to commit a crime of violence, that is, threatened to murder H.M., in violation of California Penal Code Section 422.

COUNT THIRTEEN

[18 U.S.C. §§ 1959(a)(1), 2(a)]

1.     Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.     On or about August 30, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant SAMUEL ALEXANDER PAREDES RIVAS, also known as ("aka") "Blacky," and an unindicted co-conspirator, each aiding and abetting the other, unlawfully and knowingly, with malice aforethought, murdered D.G., in violation of California Penal Code Sections 31, 187, and 189.

COUNT FOURTEEN

[18 U.S.C. § 1959(a)(1)]

1.   Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.   On or about September 27, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant JOFFRI MOLINA, also known as "Espia," unlawfully and knowingly, with malice aforethought, murdered J.R., in violation of California Penal Code Sections 31, 187, and 189.

COUNT FIFTEEN

[18 U.S.C. § 1959(a)(6)]

1.   Paragraphs 1 through 23 of the General Allegations and paragraphs 1 and 2 of Count Two of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.   Beginning on a date unknown and continuing to on or about November 10, 2015, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendant JORDIN DUARTE, also known as "Kusko," unlawfully and knowingly conspired to commit assault with a dangerous weapon, in violation of California Penal Code Sections 31, 182, and 245(a)(1).

COUNT SIXTEEN

[21 U.S.C. § 846]

Paragraphs 1 through 23 of the General Allegations are hereby re-alleged and incorporated by reference as if fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about May 10, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, RAMOS, PEREZ, JOHN GARCIA, I. GARCIA, ARDOIN, GALINDO, TORRES, CORRALES, MARTINEZ, VILLATORO, ZEPEDA, GONZALEZ, SANKIKIAN, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, RAMIREZ, E. RIVAS, M. LEIVA, and MUNOZ, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute, and possess with intent to distribute, the following controlled substances:

a.   at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

b.   at least 5 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii); and

c.   less than 50 kilograms of marijuana, or less than 50 or more marijuana plants, in violation of Title 21, United States Code, Sections 841(a) and 841(b)(1)(D).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.   MS-13 members would use violence and intimidation to control narcotics trafficking in territories controlled by MS-13. Narcotics sales comprise the majority of revenue generated by MS-13. In order to sell narcotics within MS-13's territory, one must either be an MS-13 member, an associate, or otherwise have permission from, and pay extortionate rent payments to, MS-13.

2.   MS-13 shot callers, including defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, RAMOS, PEREZ, JOHN GARCIA, I. GARCIA, and ARDOIN, and others known and unknown to the Grand Jury, would be responsible for the geographic territory under their cliques' respective control.  Within a clique's geographic boundaries, that clique, as controlled by the shot caller, would have exclusive rights to distribute narcotics.  Additionally, shot callers would be responsible for collecting, from MS-13's general members, their clique's extortionate rent payments, the bulk of which would likely be comprised of narcotics profits and proceeds.

3.   Defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, RAMOS, PEREZ, JOHN GARCIA, I. GARCIA, ARDOIN, C. LOPEZ, MOLINA, S. RIVAS, DUARTE, GALINDO, HERRERA, TORRES, CORRALES, MARTINEZ, ZEPEDA, and GONZALEZ, and others known and unknown to the Grand Jury, would plan, commit, and threaten to commit acts of violence on behalf of MS-13 in order to enhance the reputation and authority of MS-13, and to permit MS-13 to maintain control of the drug trafficking activity within MS-13's geographical boundaries.

4.    Defendants BALMORE, VIDES, PEREZ, I. GARCIA, TORRES, CORRALES, MARTINEZ, VILLATORO, GONZALEZ, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, and M. LEIVA, and others known and unknown to the Grand Jury, would possess, use, brandish, discharge, and sell firearms to enhance the culture of fear created by MS-13, thereby allowing MS-13 to maintain control of the drug trafficking activity within MS-13's geographical boundaries.

5.    Additionally, each clique member, including defendants GALINDO, TORRES, CORRALES, MARTINEZ, VILLATORO, ZEPEDA, GONZALEZ, SANKIKIAN, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, RAMIREZ, E. RIVAS, and M. LEIVA, and others known and unknown to the Grand Jury, would answer to his or her respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS member narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory, all to ensure that his or her clique could exclusively distribute narcotics within clique territory.

6.    Each MS-13 member and associate, along with wholesale narcotics suppliers and street narcotics dealers, would receive authorization from the shot callers to traffic in controlled substances within individual clique territories, and in return, would be required to pay a portion of the drug proceeds, known as a "tax," to his or her respective MS-13 shot caller for the areas in which narcotics were trafficked.

7.     Defendants MELGAR, RAMOS, and ZEPEDA, and others known and unknown to the Grand Jury, would supply controlled substances to MS-13 members and associates, as well as street narcotics dealers, who were authorized to distribute narcotics within MS-13's territories, for further distribution within these territories.

8.     Defendants VILLALOBOS, MELGAR, PEREZ, I. GARCIA, GALINDO, TORRES, VILLATORO, ZEPEDA, GONZALEZ, SANKIKIAN, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, E. RIVAS, and MUNOZ, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the territories controlled by MS-13.

9.     Defendants MELGAR, L. LOPEZ, CARRANZA, B. LEIVA, and ARENAS, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the MS-13-controlled casitas.

C.     OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants BALMORE, VILLALOBOS, LEVERON, VIDES, MELENDEZ, MELGAR, JOSE GARCIA, RAMOS, PEREZ, JOHN GARCIA, I. GARCIA, ARDOIN, GALINDO, TORRES, CORRALES, MARTINEZ, VILLATORO, ZEPEDA, GONZALEZ, SANKIKIAN, MAXION, L. LOPEZ, CARRANZA, B. LEIVA, ARENAS, RAMIREZ, E. RIVAS, M. LEIVA, and MUNOZ, and others known and unknown to the Grand Jury, committed various overt acts, within the Central District of California, and elsewhere, including the overt acts numbered 1 through 324 as set forth in Count One and hereby incorporated by reference as if fully set forth herein, on or about the dates specified therein.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about July 31, 2013, in Los Angeles County, within the Central District of California, defendant FREDY ENOC FUENTES VILLATORO, also known as "Killer," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.3 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about September 11, 2013, in Los Angeles County, within the Central District of California, defendant FREDY ENOC FUENTES VILLATORO, also known as "Killer," knowingly and intentionally distributed at least five grams, that is, approximately 27 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about July 10, 2014, in Los Angeles County, within the Central District of California, defendant JESSE PEREZ, also known as "Grinch," knowingly and intentionally distributed at least 50 grams, that is, approximately 56.1 grams, of methamphetamine, a Schedule II controlled substance.

1                          COUNT TWENTY

2                 [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3          On or about July 15, 2014, in Los Angeles County, within the

4    Central District of California, defendant LUIS LOPEZ, also known as

5    ("aka") "Lester G. Arroyo-Hernandez," aka "Lester Arroyo," aka

6    "Flaco," knowingly and intentionally distributed at least 50 grams,

7    that is, approximately 54.5 grams, of methamphetamine, a Schedule II

8    controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 2, 2014, in Los Angeles County, within the Central District of California, defendant DOUGLAS HENRY GONZALEZ, also known as "Silly," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 9, 2014, in Los Angeles County, within the Central District of California, defendant SERGIO ALEXANDER GALINDO, also known as ("aka") "Romeo A. Velasquez," aka "Killer," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 16, 2014, in Los Angeles County, within the Central District of California, defendant SERGIO ALEXANDER GALINDO, also known as ("aka") "Romeo A. Velasquez," aka "Killer," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 18, 2014, in Los Angeles County, within the Central District of California, defendant DOUGLAS HENRY GONZALEZ, also known as "Silly," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about January 29, 2015, in Los Angeles County, within the Central District of California, defendants MAGGIE SANKIKIAN, also known as ("aka") "Goofy," and JOAQUIN MUNOZ aka "Vago," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 82.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about February 18, 2015, in Los Angeles County, within the Central District of California, defendant CARLOS A. ZEPEDA, also known as ("aka") "Antonio Meza," aka "Blackie," knowingly and intentionally distributed at least 50 grams, that is, approximately 445.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about March 5, 2015, in Los Angeles County, within the Central District of California, defendants MAGGIE SANKIKIAN, also known as ("aka") "Goofy," and JOAQUIN MUNOZ, aka "Vago," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 54.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 14, 2015, in Los Angeles County, within the Central District of California, defendant DARYLL DEVONNE MAXION, also known as "Rocket," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 23, 2015, in Los Angeles County, within the Central District of California, defendant DARYLL DEVONNE MAXION, also known as "Rocket," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about May 5, 2015, in Los Angeles County, within the Central District of California, defendant CARLOS A. ZEPEDA, also known as ("aka") "Antonio Meza," aka "Blackie," knowingly and intentionally distributed at least 50 grams, that is, approximately 84.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 8, 2015, in Los Angeles County, within the Central District of California, defendant EVER RIVAS, also known as "Satanas," knowingly and intentionally distributed at least 50 grams, that is, approximately 218.3 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 21, 2016, in Los Angeles County, within the Central District of California, defendant ERWIN ALEXANDER MELGAR, also known as "Snoopy," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 28, 2016, in Los Angeles County, within the Central District of California, defendant ERWIN ALEXANDER MELGAR, also known as "Snoopy," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. § 2(a)]

On or about November 19, 2016, in Los Angeles County, within the Central District of California, defendants ROBERTO ESTRADA CARRANZA, also known as ("aka") "Espanto," BALTHAZAR LEIVA, aka "Diablo," and ALEJANDRO SALVADOR ARENAS, each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 19.92 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FIVE

[18 U.S.C. §§ 924(c)(1)(A)(iii), 2(a)]

On or about August 9, 2015, in Los Angeles County, within the Central District of California, defendants MOISES VILLALOBOS, also known as ("aka") "Guerillero," and an unindicted co-conspirator, each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One of this Indictment, and Violent Crime in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5), as charged in Count Seven of this Indictment, and in so doing, discharged the firearm.

COUNT THIRTY-SIX

[18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1)]

On or about August 15, 2015, in Los Angeles County, within the Central District of California, defendant CARLOS ALFREDO CARDOZA LOPEZ, also known as "Little Boy" ("C. LOPEZ"), knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One of this Indictment, and Violent Crime in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(1), as charged in Count Eight of this Indictment, and in so doing, discharged the firearm.

Defendant C. LOPEZ, through his use of the firearm and acting willfully, deliberately, maliciously, and with premeditation and malice aforethought, further murdered and caused the death of E.M.

COUNT THIRTY-SEVEN

[18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1), 2(a)]

On or about August 30, 2015, in Los Angeles County, within the Central District of California, defendants SAMUEL ALEXANDER PAREDES RIVAS, also known as ("aka") "Blacky" ("S. RIVAS"), and an unindicted co-conspirator, each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Violent Crime in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(1), as charged in Count Thirteen of this Indictment, and in so doing, discharged the firearm.

Defendant S. RIVAS through his use of the firearm and acting willfully, deliberately, maliciously, and with premeditation and malice aforethought, further murdered and caused the death of D.G.

COUNT THIRTY-EIGHT

[18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1)]

On or about September 27, 2015, in Los Angeles County, within the Central District of California, defendant JOFFRI MOLINA, also known as "Espia" ("MOLINA"), knowingly used and carried a firearm during and in relation to a crime of violence, namely, Racketeer Influenced and Corrupt Organizations Conspiracy, in violation of Title 18, United States Code, Section 1962(d), as charged in Count One of this Indictment, and Violent Crime in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(1), as charged in Count Fourteen of this Indictment, and in so doing, discharged the firearm.

Defendant MOLINA, through his use of the firearm and acting willfully, deliberately, maliciously, and with premeditation and malice aforethought, further murdered and caused the death of J.R.

115

COUNT THIRTY-NINE

[18 U.S.C. §§ 924(c)(1)(A)(i), 2(a)]

On or about November 19, 2016, in Los Angeles County, within the Central District of California, defendants ROBERTO ESTRADA CARRANZA, also known as ("aka") "Espanto," BALTHAZAR LEIVA, aka "Diablo," and ALEJANDRO SALVADOR ARENAS, each aiding and abetting the other, knowingly possessed a firearm in furtherance of a drug trafficking crime, namely, Possession With Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Thirty-Four of this Indictment.

COUNT FORTY

[18 U.S.C. § 922(g)(1)]

On or about August 14, 2014, in Los Angeles County, within the Central District of California, defendant SERGIO ALEXANDER GALINDO, also known as ("aka") "Romeo A. Velasquez," aka "Killer" ("GALINDO"), knowingly possessed a firearm, namely, a Taurus, Model 85, .380 caliber revolver, bearing serial number JC68874, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GALINDO had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Carrying a Concealed Weapon, in violation of California Penal Code Section 12025(a)(2), in the Superior Court of the State of California, County of Los Angeles, case number BA236769, on or about November 5, 2002.

1                              COUNT FORTY-ONE

2                          [18 U.S.C. § 922(g)(1)]

3        On or about September 9, 2014, in Los Angeles, County, within

4   the Central District of California, defendant SERGIO ALEXANDER

5   GALINDO, also known as ("aka") "Romeo A. Velasquez," aka "Killer"

6   ("GALINDO"), knowingly possessed a firearm, namely, a Sig Sauer,

7   model P228, 9mm pistol, bearing serial number B209535, in and

8   affecting interstate and foreign commerce.

9        Such possession occurred after defendant GALINDO had been

10  convicted of a felony crime punishable by a term of imprisonment

11  exceeding one year, namely, Carrying a Concealed Weapon, in violation

12  of California Penal Code Section 12025(a)(2), in the Superior Court

13  of the State of California, County of Los Angeles, case number

14  BA236769, on or about November 5, 2002.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.   Paragraphs 1 through 23 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.   The allegations contained in Count One of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of any defendant's conviction under Count One of this Indictment.

3.   Any and each defendant convicted of Count One of this Indictment shall forfeit to the United States:

a.   any interest said defendant has acquired or maintained in violation of Title 18, United States Code, Section 1962;

b.   any interest in, security of, claim against, or property or contractual right affording a source of influence over, any enterprise which said defendant has established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c.   any property constituting or derived from any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

4.   Pursuant to Title 18, United States Code, Section 1963(m), each defendant so convicted shall forfeit substitute property, up to

119

the value of the property described in the preceding paragraph, if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

5.   Any defendant convicted of Count One of this Indictment, and each such defendant, is jointly and severally liable for the forfeiture obligations as alleged above.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 853]

1.    Paragraphs 1 through 23 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Counts Sixteen through Thirty-Four of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 21, United States Code, Section 853.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 853, in the event of any defendant's conviction under any of Counts Sixteen through Thirty-Four of this Indictment.

3.    Each defendant convicted of any of Counts Sixteen through Thirty-Four of this Indictment shall forfeit to the United States the following:

a.    All right, title, and interest in any and all property, real or personal (i) constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any such offense; and (ii) used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, any such offense; and

b.    A sum of money equal to the total value of the property described in paragraph 3.a.  For each of Counts Sixteen through Thirty-Four of this Indictment for which more than one defendant is found guilty, each such defendant shall be jointly and

121

1   severally liable for the entire amount ordered forfeited pursuant to
2   that count.
3       4.   Pursuant to Title 21, United States Code, Section 853(p),
4   each defendant convicted of any of Counts Sixteen through Thirty-Four
5   of this Indictment shall forfeit substitute property, up to the total
6   value of the property described in the preceding paragraph if, as the
7   result of any act or omission of a defendant, the property described
8   in the preceding paragraph, or any portion thereof: (a) cannot be
9   located upon the exercise of due diligence; (b) has been transferred,
10  sold to, or deposited with a third party; (c) has been placed beyond
11  the jurisdiction of the court; (d) has been substantially diminished
12  in value; or (e) has been commingled with other property that cannot
13  be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d); 26 U.S.C. § 5872; 28 U.S.C. § 2461(c)]

1.    Paragraphs 1 through 23 of the General Allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    The allegations contained in Counts Thirty-Five through Forty-One of this Indictment are hereby repeated, re-alleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 924(d), Title 26, United States Code, Section 5872, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under any of Counts Thirty-Five through Forty-One of this Indictment.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 924(d), Title 26, United States Code, Section 5872, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under any of Counts Thirty-Five through Forty-One of this Indictment.

3.    Upon any defendant's conviction under any of Counts Thirty-Five through Forty-One of this Indictment, such defendant shall forfeit to the United States any firearms and/or ammunition involved in, used, or received or possessed in the knowing commission of such offense.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to the value of

123

the property described in the preceding paragraph, if, as the result
of any act or omission of that defendant, the property described in
the preceding paragraph, or any portion thereof: (a) cannot be
located upon the exercise of due diligence; (b) has been transferred,
sold to, or deposited with a third party; (c) has been placed beyond
the jurisdiction of the court; (d) has been substantially diminished
in value; or (e) has been commingled with other property that cannot
be divided without difficulty.

NOTICE OF SPECIAL FINDINGS

The allegations of Counts Eight, Thirteen, and Fourteen of this Indictment are hereby re-alleged and incorporated by reference as if fully set forth herein.

As to Count Eight, defendant CARLOS ALFREDO CARDOZA LOPEZ, also known as ("aka") "Little Boy":

1.   Was 18 years of age or older at the time of the offense (18 U.S.C. § 3591(a));

2.   Intentionally killed E.M. (18 U.S.C. § 3591(a)(2)(A));

3.   Intentionally inflicted serious bodily injury that resulted in the death of E.M. (18 U.S.C. § 3591(a)(2)(B));

4.   Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant of the offense, and E.M. died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

5.   Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than a participant of the offense, such that participation in the act constituted a reckless disregard for human life and E.M. died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D)); and

6.   Intentionally killed or attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

As to Count Thirteen, defendant SAMUEL ALEXANDER PAREDES RIVAS, aka "Blacky":

7.   Was 18 years of age or older at the time of the offense (18 U.S.C. § 3591(a));

1       8.   Intentionally killed D.G. (18 U.S.C. § 3591(a)(2)(A));

2       9.   Intentionally inflicted serious bodily injury that resulted

3  in the death of D.G. (18 U.S.C. § 3591(a)(2)(B));

4      10.  Intentionally participated in an act, contemplating that

5  the life of a person would be taken or intending that lethal force

6  would be used in connection with a person, other than a participant

7  of the offense, and D.G. died as a direct result of the act (18

8  U.S.C. § 3591(a)(2)(C)); and

9      11.  Intentionally and specifically engaged in an act of

10  violence, knowing that the act created a grave risk of death to a

11  person, other than a participant of the offense, such that

12  participation in the act constituted a reckless disregard for human

13  life and D.G. died as a direct result of the act (18 U.S.C.

14  § 3591(a)(2)(D)).

15     As to Count Fourteen, defendant JOFFRI MOLINA, aka "Espia":

16      12.  Was 18 years of age or older at the time of the offense (18

17  U.S.C. § 3591(a));

18      13.  Intentionally killed J.R. (18 U.S.C. § 3591(a)(2)(A));

19      14.  Intentionally inflicted serious bodily injury that resulted

20  in the death of J.R. (18 U.S.C. § 3591(a)(2)(B));

21      15.  Intentionally participated in an act, contemplating that

22  the life of a person would be taken or intending that lethal force

23  would be used in connection with a person, other than a participant

24  of the offense, and J.R. died as a direct result of the act (18

25  U.S.C. § 3591(a)(2)(C)); and

26      16.  Intentionally and specifically engaged in an act of

27  violence, knowing that the act created a grave risk of death to a

28  person, other than a participant of the offense, such that

1  participation in the act constituted a reckless disregard for human

2  life and J.R. died as a direct result of the act (18 U.S.C.

3  § 3591(a)(2)(D)).

4

5                                        A TRUE BILL

6

7                                        _____
                                         Foreperson
8

9  SANDRA R. BROWN
   Acting United States Attorney
10

11

12 LAWRENCE S. MIDDLETON
   Assistant United States Attorney
13 Chief, Criminal Division

14 JUSTIN R. RHOADES
   Assistant United States Attorney
15 Chief, Violent and Organized
   Crime Section
16
   JOANNA M. CURTIS
17 JEFFREY M. CHEMERINKSY
   Assistant United States Attorneys
18 Violent and Organized Crime
   Section
19

20

21

22

23

24

25

26

27

28